[No. S032488. Dec. 28, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS SOUZA, Defendant and Appellant.

**COUNSEL**

Lawrence A. Gibbs, under appointment by the Supreme Court, and Blair Griffith, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias, Martin S. Kane and Richard Rochman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—When a person takes "flight" at the sight of a police officer, may the officer temporarily detain the person for questioning? Because under the Fourth Amendment the lawfulness of a temporary detention depends not on any one circumstance viewed in isolation, but upon the totality of the circumstances known to the detaining officer, we decline to establish a "bright-line" rule that flight without more provides cause to detain. We recognize, however, that flight in response to the appearance of a uniformed officer or a marked patrol car ordinarily is behavior that police may legitimately regard as suspicious, and therefore also can be a key factor in establishing reasonable cause to detain in a particular case. Applying these conclusions to the facts here, we uphold the temporary detention at issue as lawful, and we reverse the Court of Appeal.

I

Defendant Carlos Souza, who was charged with possession of cocaine for sale (Health & Saf. Code, § 11351), moved to suppress the prosecution's

evidence against him, contending it was the fruit of a warrantless search after an unlawful detention (Pen. Code, § 1538.5).[1]

At the hearing on the suppression motion, Watsonville Police Officer Lance Stackhouse testified that at approximately 3 a.m. on July 27, 1991, he was in uniform and patrolling a residential area of Watsonville in a marked police car. He described the neighborhood as a "a high crime area" known for burglary and drug activities.

Near the intersection of Pennsylvania Avenue and Hammer, in the exact area where he had recently made two arrests, including one for burglary, Officer Stackhouse noticed two people, a man and a woman, standing near a blue Ford automobile parked at the curb. The area was almost completely dark as the streetlights were out of order. The man (later identified as defendant) appeared to be talking to someone in the parked car. Suspecting an auto burglary in progress, the officer stopped his car behind the Ford and activated the patrol car's spotlight, shining it into the Ford. Immediately, two people in the front seat of the Ford bent down toward the floorboard, and defendant took off running. Officer Stackhouse stopped defendant and conducted a cursory search for weapons. During the "pat-down," a plastic baggie containing 14.5 grams of cocaine fell out of defendant's clothing.

The trial court denied defendant's motion to suppress the cocaine, concluding that Officer Stackhouse had reasonable cause to detain defendant. Dispositive to the court's ruling was defendant's flight from the approaching police car.

Thereafter, defendant pleaded guilty to possession of cocaine for sale (Health & Saf. Code, § 11351); he was sentenced to five years' probation conditioned on serving one hundred eighty days in county jail.

On appeal, defendant challenged the trial court's denial of his motion to suppress evidence. (§ 1538.5, subd. (m).) The Court of Appeal reversed the judgment of conviction, concluding that Officer Stackhouse lacked reasonable cause to suspect defendant of criminal activity, thus rendering his subsequent detention unlawful and the cocaine found in the patdown search inadmissible as evidence in defendant's criminal trial. The Court of Appeal directed the trial court to allow defendant to withdraw his guilty plea and to grant defendant's suppression motion.

The Court of Appeal gave no weight to Officer Stackhouse's description of the neighborhood as "a high crime area" because, in the court's words,

---

[1]Unless otherwise indicated, further statutory references are to the Penal Code.

"Stackhouse did not testify that any specific type of criminal activity relevant to this detention regularly occurred in this area." In contrast to the trial court, the Court of Appeal placed little significance on defendant's flight. Rather, the Court of Appeal concluded that all of the facts known to the officer, including defendant's flight, "did not support an objectively reasonable suspicion that defendant was involved in criminal activity." In support of this conclusion, the court cited *People* v. *Aldridge* (1984) 35 Cal.3d 473 [198 Cal.Rptr. 538, 674 P.2d 240]. There, this court invalidated a detention based on the defendant's flight from a parking lot when police entered the lot, which was known as a site for drug transactions. The *Aldridge* court stated that a detention involving flight was valid only when flight was an additional factor to confirm other evidence of the defendant's involvement in criminal activity. (*Id.* at p. 479.)

We granted the Attorney General's petition for review, to consider the continuing validity of *People* v. *Aldridge, supra,* 35 Cal.3d 473, and to decide whether a person's flight upon encountering a police officer is in itself sufficient to justify an investigative detention.

## II

■ The Fourth Amendment to the United States Constitution prohibits seizures of persons, including brief investigative stops, when they are "unreasonable." (*Terry* v. *Ohio* (1968) 392 U.S. 1, 19 & fn. 16 [20 L.Ed.2d 889, 904-905, 88 S.Ct. 1868]; *United States* v. *Sharpe* (1985) 470 U.S. 675, 682 [84 L.Ed.2d 605, 613, 105 S.Ct. 1568].) Our state Constitution has a similar provision. (Cal. Const., art. I, § 13.) A seizure occurs whenever a police officer "by means of physical force or show of authority" restrains the liberty of a person to walk away. (*Terry* v. *Ohio, supra,* 392 U.S. 1, 19, fn. 16 [20 L.Ed.2d 889, 904-905].)

At issue in *Terry* v. *Ohio, supra,* 392 U.S. 1, was the constitutionality of a police procedure commonly known as a "frisk" or "pat-down" in which police officers conducting an investigation search a suspect for concealed weapons. Describing the procedure as "a serious intrusion upon the sanctity of the person," the United States Supreme Court nevertheless concluded that it was not "unreasonable" if the police officer could "point to specific and articulable facts which, taken together with rational inferences from those facts," would warrant the intrusion. (*Id.* at pp. 17, 20-21 [20 L.Ed.2d at pp. 903-904, 905-906].) Because the "intrusion upon the sanctity of the person" consists not only of the patdown itself but also of the temporary detention during which the patdown occurs, to justify frisking or patting down a person during an on-the-street stop, "the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop." (*Id.* at p. 32 [20 L.Ed.2d at p. 912] (conc. opn. of Harlan, J.), original italics.)

When are facts known to a police officer constitutionally sufficient to justify a forcible stop? On a number of occasions since its landmark decision in *Terry* v. *Ohio, supra,* 392 U.S. 1, the high court has reiterated that a police officer's seizure of a person need not in all cases be justified by probable cause to arrest for a crime. (*Florida* v. *Royer* (1983) 460 U.S. 491, 498 [75 L.Ed.2d 229, 236-237, 103 S.Ct. 1319].) Probable cause to arrest exists when the facts and circumstances known to the arresting officer " ' "warrant a [person] of reasonable caution in the belief that" an offense has been or is being committed [by the person to be arrested].' " (*Dunaway* v. *New York* (1979) 442 U.S. 200, 208, fn. 9 [60 L.Ed.2d 824, 883, 99 S.Ct. 2248], quoting *Carroll* v. *United States* (1925) 267 U.S. 132, 162 [69 L.Ed. 543, 555, 45 S.Ct. 280, 39 A.L.R. 790].) By contrast, the temporary detention of a person for the purpose of investigating possible criminal activity may, because it is less intrusive than an arrest, be based on "some objective manifestation" that criminal activity is afoot and that the person to be stopped is engaged in that activity. (*United States* v. *Cortez* (1981) 449 U.S. 411, 417 & fn. 2 [66 L.Ed.2d 621, 628, 101 S.Ct. 690]; see also *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957] [in which this court articulated a two-part test: (1) that some activity relating to crime has taken place, is occurring, or is about to occur; and (2) that the person to be detained is involved in that activity].)

In *United States* v. *Cortez, supra,* 449 U.S. 411, the high court stressed the importance of taking into account "the totality of the circumstances" in determining the propriety of an investigative stop or temporary detention: "Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." (*Id.* at pp. 417-418 [66 L.Ed.2d at pp. 628-629].)

In *United States* v. *Sokolow* (1989) 490 U.S. 1, 7 [104 L.Ed.2d 1, 10, 109 S.Ct. 1581], the high court reiterated its view that the "reasonable suspicion" necessary to justify a brief, investigative detention is a level of suspicion that is "obviously less demanding than that for probable cause" and can be established by "considerably less than proof of wrongdoing by a preponderance of the evidence." Thereafter, in *Alabama* v. *White* (1990) 496 U.S. 325, 330 [110 L.Ed.2d 301, 308-309, 110 S.Ct. 2412], the United States Supreme Court characterized "reasonable suspicion" as a standard less demanding

than probable cause "not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

From these decisions by the United States Supreme Court we distill this principle: A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity. With this standard in mind, we examine our decision in *People* v. *Aldridge, supra*, 35 Cal.3d 473.

## III

In *People* v. *Aldridge, supra*, 35 Cal.3d 473, the defendant, who stood in a group of people gathered in a liquor store's parking lot, ran when a police car entered the lot at 10:15 p.m. This conduct by the defendant, coupled with the fact that the parking lot was a place where drug activities were common and people were frequently armed, prompted the officers to stop the defendant for questioning. One of the officers had made over 200 arrests in the area and knew that a few hours earlier other officers had made 3 narcotics arrests in the parking lot. Based on this evidence, the trial court ruled that the police had reasonable cause to detain the defendant. This court disagreed.

The *Aldridge* court began its analysis with the observation that the police officers had indisputably seized the defendant, and that therefore it was necessary to decide whether the seizure was "reasonable" when tested against the requirements of our state Constitution. (35 Cal.3d at pp. 477-478, citing Cal. Const., art. I, § 13.) In doing so, this court examined three factors that might provide objective justification for the detention: the incident took place at night, in an area where drug transactions were common, and the defendant apparently sought to evade the police. (35 Cal.3d at p. 478.) We concluded that these factors "[w]hether considered separately or together" did not justify the detention. (*Ibid.*) The first two factors we dismissed summarily, finding nothing unusual or suspicious about a person's presence in a liquor store parking lot at 10:15 p.m., or in a " 'high crime area.' " (*Ibid.*) With respect to the third factor, the defendant's flight from police, we stated: "Finally, the suggestion that an apparent effort to avoid a police officer may justify a detention has been refuted in numerous decisions of this court. (*People* v. *Bower* [(1979) 24 Cal.3d 638, 647-648 (156 Cal.Rptr. 856, 597 P.2d 115)].) *Under different circumstances, such flight might imply a consciousness of guilt, and combined with other objective factors could justify an*

*investigative stop.* Here, however, [the officer] admittedly intended to follow his routine practice to make an indiscriminate investigative detention of all persons on the lot. The record reveals that defendant had previously been detained and interviewed by [the officer] on [the] lot, and it can safely be assumed that he knew what was in store for him if he were to remain. Defendant had every right to avoid such persistent harassment." (*People* v. *Aldridge, supra,* 35 Cal.3d at p. 479, italics added.)

The Attorney General contends that the quoted passage misstates Fourth Amendment law in two respects: (1) the possibility of an innocent explanation for a person's flight from a police officer does not negate the suspicion inherent in the flight; and (2) flight need not be "combined with other objective factors" to justify a detention. According to the Attorney General, flight from the police satisfies both requirements of the "reasonable cause" test that this court established in *In re Tony C., supra,* 21 Cal.3d 888, 893: it suggests criminal activity and the fleeing person's involvement in that activity.[2] ▮ Because the Attorney General has framed the issue of flight against the backdrop of our decision in *People* v. *Aldridge, supra,* 35 Cal.3d 473, we first consider whether *Aldridge* is pertinent authority here. It is not, as we shall explain.

In the June 1982 Primary Election, California voters enacted Proposition 8, an initiative containing a Truth-in-Evidence provision (Cal. Const., art. I, § 28, subd. (d)), which, for crimes committed after its enactment (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149]), permitted exclusion of relevant but unlawfully obtained evidence only if the exclusion was required by the United States Constitution (*In re Lance W.* (1985) 37 Cal.3d 873, 885-890 [210 Cal.Rptr. 631, 694 P.2d 744]). Our decision in *People* v. *Aldridge, supra,* 35 Cal.3d 473, although issued 18 months after Proposition 8's enactment, addressed a detention for criminal conduct predating Proposition 8. Although we mentioned Fourth Amendment precedent in *Aldridge,* we did so only in laying out the general rules of detention law. (*People* v. *Aldridge, supra,* 35 Cal.3d at pp. 477-478.) But in discussing the legality of the defendant's detention, *Aldridge* made no mention of the federal Constitution or of Fourth Amendment precedent. Rather, after its summary of general principles on detentions, citing federal as well as California cases, *Aldridge* at page 478 phrased the issue this way: "It thus becomes necessary to test [the police officer's] actions against the requirements of article I, section 13, of the California Constitution." Because the *Aldridge* holding rested solely on California constitutional grounds, it is

---

[2]In making this argument, the Attorney General explains that by the term "flight" he means running in apparent response to the presence of a police officer. The facts of this case satisfy this definition.

not pertinent authority for determining the propriety of the temporary detention in this post-Proposition 8 case; the issue, as we just explained, must be resolved under the federal Constitution.

In the section that follows, we consider whether the Fourth Amendment permits treating flight from a police officer as a suspicious circumstance even though there may be some innocent explanation for the flight, and whether flight must be combined with other objective factors to warrant a temporary detention.

## IV

The Attorney General asserts that the possibility of an innocent explanation for a person's flight from a police officer does not mean that the flight is irrelevant in determining reasonable cause to detain. We agree. In *In re Tony C., supra,* 21 Cal.3d 888, 893, we accepted this principle when we disapproved dictum in *Irwin* v. *Superior Court* (1969) 1 Cal.3d 423, 427 [82 Cal.Rptr. 484, 462 P.2d 12], that if "events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful." The *Irwin* dictum, we explained, "cannot be squared with the rule that a reasonable suspicion of involvement in criminal activity will justify a temporary stop or detention." Rather, when circumstances are " 'consistent with criminal activity,' they permit—even demand—an investigation . . . ." (*In re Tony C., supra,* 21 Cal.3d at p. 894.) A different result is not warranted merely because circumstances known to an officer may also be " 'consistent with lawful activity.' " (*Ibid.*) As we said: "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of [police] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal . . . ." (*Ibid.*)

Does our conclusion in *In re Tony C., supra,* 21 Cal.3d 888—that conduct consistent with criminal behavior supports reasonable cause to detain even if the conduct is also consistent with innocent behavior—apply when the conduct in question is a person's flight from police? In contending that it does not, defendant points to a statement in our decision in *People* v. *Bower* (1979) 24 Cal.3d 638, 648 [156 Cal.Rptr. 856, 597 P.2d 115] suggesting that a person's flight from police will *not* support a detention because everyone is at liberty to avoid contact with the police.

In *Bower,* police detained a White man when they saw him at approximately 8:30 in the evening walking with several Black people toward the parking lot of a public housing project in a predominantly Black area. One of

the two officers testified that during the three and one-half years he had patrolled the area he had " 'never observed a white person in the projects or around the projects on foot in the hours of darkness . . . for innocent purpose.' " (24 Cal.3d at p. 642.) Suspecting criminal behavior in this instance, the officers approached the group, which quickly dispersed, with the defendant leaving in "a 'very quick walk, almost a run' " in a direction away from the housing project. (*Id.* at p. 643.) Addressing the possible significance of the defendant's flight, we first observed that an individual is free to avoid contact with a police officer, and then explained that "[t]o hold that the mere exercise of this liberty justifies a detention would be tantamount to holding that an officer may insist upon an encounter without adequate cause." (*Id.* at p. 648.) Four years later, the United States Supreme Court came to a similar conclusion in *Florida* v. *Royer, supra,* 460 U.S. 491.

At issue in *Florida* v. *Royer* was an airport search of two suitcases belonging to a nervous young man who had paid cash for an airline ticket from Miami to New York City under an assumed name and who was approached by two narcotics officers who believed that the man's characteristics fit a "drug courier profile." In the course of the opinion, the high court considered whether approaching the traveler for questioning was a seizure, concluding it was not. (460 U.S. at p. 493, fn. 2 [75 L.Ed.2d at p. 233].) As the court explained, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." (*Id.* p. 497 [75 L.Ed.2d at p. 236].) The court pointed out, however, that a person approached by police for questioning "*need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.* [Citations.] He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, *without more,* furnish those grounds." (*Id.* at 498 [75 L.Ed.2d at p. 237], italics added.)

The United States Supreme Court's observation in *Florida* v. *Royer, supra,* 460 U.S. 491, 498 [75 L.Ed.2d 229, 236-237], that a person approached by police for questioning may decline to answer the questions and "may go on his way," does not imply that the *manner* in which a person avoids police contact cannot be considered by police officers in the field or by courts assessing reasonable cause for briefly detaining the person. There is an appreciable difference between declining to answer a police officer's questions during a street encounter and fleeing at the first sight of a uniformed police officer. Because the latter shows not only unwillingness to

partake in questioning but also unwillingness to be observed and possibly identified, it is a much stronger indicator of consciousness of guilt.

We conclude that even though a person's flight from approaching police officers may stem from an innocent desire to avoid police contact, flight from police is a proper consideration—and indeed can be a key factor—in determining whether in a particular case the police have sufficient cause to detain.

## V

■ The Attorney General also contends that flight upon encountering a uniformed police officer or a marked patrol car is alone sufficient to justify a detention, and urges us to adopt a "bright-line" rule. As we pointed out earlier, however, the United States Supreme Court has stressed that, in determining whether a detention meets Fourth Amendment standards, courts must consider "the totality of the circumstances—the whole picture." (*United States* v. *Cortez, supra*, 449 U.S. 411, 417 & fn. 2 [66 L.Ed.2d 621, 628].) Therefore, adoption of a "bright-line" rule would run counter to the high court's express admonition.

In arguing that a person's flight from approaching police provides, by itself, sufficient cause to detain, the Attorney General points out that the criminal law has long viewed a suspect's flight from authority as a strong indicator of guilt. In support, he cites *Alberty* v. *United States* (1896) 162 U.S. 499, 510 [40 L.Ed. 1051, 1056, 16 S.Ct. 864], and *Allen* v. *United States* (1896) 164 U.S. 492, 499 [41 L.Ed. 528, 530, 17 S.Ct. 154], in which the high court nearly a century ago held that flight tends to prove guilt and therefore is a circumstance that is proper for jury consideration. This view, the Attorney General notes, is reflected in a standard jury instruction that tells California juries in criminal cases that a person's flight immediately after the commission of a crime or after being accused of a crime, while standing alone is insufficient to establish guilt, may be considered in determining guilt or innocence. (CALJIC No. 2.52; see also § 1127c.)

The Attorney General argues that to permit courts and juries to draw an inference of guilt from a defendant's flight after the commission of a crime or after being accused of a crime "but to deny such reliance to law enforcement officers would be curious indeed." Not at all.

The authorities the Attorney General cites allow an inference of guilt from flight only in those instances in which there is other indication of criminality, such as evidence that the defendant fled from a crime scene or after

being accused of a crime. To put it succinctly, these authorities rely on "flight plus." Thus, they are of no help in determining whether flight alone indicates criminal activity.

The Attorney General cites a number of cases from other jurisdictions that, according to the Attorney General, have held that flight alone, without other indicia of criminal activity, will justify an investigative stop by police. A close examination of these cases reveals that most do not so hold.

In five of the seven cases cited, flight from police was only one of several factors that the reviewing court relied on in upholding the temporary detention. (See *United States* v. *Lane* (6th Cir. 1990) 909 F.2d 895 [flight by several occupants of an apartment house known for drug trafficking together with anonymous tip of drug dealing justified detention]; *State* v. *Stinnett* (1988) 104 Nev. 398 [760 P.2d 124] [known drug dealer huddling with three others in an area known for street sales of narcotics fled when he spotted police]; *United States* v. *Haye* (4th Cir. 1987) 825 F.2d 32 [two men arriving on a flight from Miami and exhibiting characteristics of the "drug courier profile" ran when approached by local police and Drug Enforcement Administration agents who held up their law enforcement badges]; *United States* v. *Pope* (6th Cir. 1977) 561 F.2d 663 [when Drug Enforcement Administration agent in the Cleveland Airport identified himself to arriving passenger who exhibited drug courier characteristics, the passenger assaulted the agent with his briefcase, then ran into a nearby construction site where he withdrew a white bag from his coat and stuffed it into the sewer]; *City of St. Paul* v. *Vaughn* (1975) 306 Minn. 337 [237 N.W.2d 365] [officers pursued the defendant's car after they mistook him for his brother whose license had been suspended; as the defendant fled, the officers thought they saw a .45-caliber automatic pistol in his hand].)

As defendant points out, only two of the seven cases that the Attorney General cites have held that flight from police is, by itself, sufficient to provide reasonable cause to detain. (See *Platt* v. *State* (Ind. 1992) 589 N.E.2d 222; *State* v. *Anderson* (1990) 155 Wis.2d 77 [454 N.W.2d 763].) Of those two, one (*Platt*) simply accepted the reasoning of the other (*Anderson*). An analysis of these two cases follows.

In *State* v. *Anderson*, *supra*, 454 N.W.2d 763, police received complaints that the defendant was parking his car in private business stalls behind his residence. Two officers in a squad car recognized the defendant's car as it pulled into an alley abutting the business stalls. Upon spotting the squad car, the defendant drove off, attaining a speed of 30 miles per hour. The officers stopped him and in the ensuing search of his car found a revolver and three

knives. (*Id.* at pp. 764-765.) The Supreme Court of Wisconsin upheld the stop, reasoning that it was justified by the defendant's evasive behavior alone. (*Id.* at p. 768.) Expressing the view that "[f]light at the sight of police is undeniably suspicious behavior," the Wisconsin court concluded that a reasonable officer "cannot ignore the inference that criminal activity may well be afoot." (*Id.* at p. 766.)

Thereafter, in *Platt* v. *State, supra,* 589 N.E.2d 222, the Indiana Supreme Court (with one justice dissenting) upheld the detention of a motorist who sped away when sheriff's deputies pulled up behind his parked car. (*Id.* at p. 225.) The Indiana court rested its holding on the Wisconsin Supreme Court's decision in *State* v. *Anderson, supra,* 454 N.W.2d 763. After first observing that "[f]light at the sight of police is undeniably suspicious behavior," the Indiana Supreme Court concluded that detaining the fleeing person was justified to permit the sheriff's deputies to resolve the ambiguity created by the defendant's flight. (*Platt* v. *State, supra,* 589 N.E.2d. at p. 226.) The court added that it "[would] not proscribe such a reasonable response to an inherently suspicious activity." (*Ibid.*)

We find neither case persuasive authority for adopting the Attorney General's suggested "bright-line" rule that a person's evasion of police by running away or by driving away is, regardless of the surrounding circumstances, sufficient to draw an inference of criminal activity on the part of the fleeing person. To do so would run afoul of the United States Supreme Court's express admonition that courts take into account "the totality of the circumstances—the whole picture" in assessing whether the particularized and objective facts known to police provided cause to detain. (*United States* v. *Cortez, supra,* 449 U.S. at p. 417 [66 L.Ed.2d at p. 629].)

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible." (*United States* v. *Cortez, supra,* 449 U.S. 411, 418 [66 L.Ed.2d 621, 629].) The first is that the assessment must be based on all of the circumstances, including objective observations, information from police reports, and "consideration of the modes or patterns of operation of certain kinds of lawbreakers." (*Ibid.*) From these data, the court said, a trained police officer could draw inferences "that might well elude an untrained person." (*Ibid.*)

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." (*United States* v. *Cortez, supra,* 449 U.S.

at p. 418 [66 L.Ed.2d at p. 629].) Stated another way, there must be "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." (*Id.* at p. 417 [66 L.Ed.2d at pp. 628-629], fn. omitted.) This two-part assessment, as required by the United States Supreme Court, does not lend itself successfully to creating the "bright-line" rule the Attorney General seeks here.

Indeed, recently the high court itself has eschewed the adoption of "bright-line" rules in detention cases. As the court observed in *Michigan* v. *Chesternut* (1988) 486 U.S. 567, 572 [100 L.Ed.2d 565, 571, 108 S.Ct. 1975]: "Both petitioner and respondent, it seems to us, in their attempts to fashion a bright-line rule applicable to all investigatory pursuits, have failed to heed this Court's clear direction that any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account ' "all of the circumstances surrounding the incident" ' in each individual case."

More recently, in *United States* v. *Sokolow, supra,* 490 U.S. 1, the high court granted certiorari in a decision by the United States Court of Appeals for the Ninth Circuit that raised "serious implications for the enforcement of the federal narcotics laws." (*Id.* at p. 7 [104 L.Ed.2d at p. 10].) By a divided vote, the Ninth Circuit had reversed the defendant's conviction for possession of cocaine with the intent to distribute, holding that the agents of the Drug Enforcement Administration who had detained and then searched the defendant in the Honolulu airport lacked a "reasonable suspicion" to justify the stop based on the following facts: The defendant, traveling under a false name, had paid $2,100 in cash from a roll of $20 bills for two round-trip tickets from Honolulu to Miami, a city known to be a source for illicit drugs. There were other suspicious circumstances. The defendant spent only 48 hours in Miami even though the round-trip flight between Honolulu and Miami takes some 20 hours. And he appeared nervous and checked none of his luggage during the trip. (*Id.* at pp. 3, 6 [104 L.Ed.2d at pp. 7-8, 9-10].)

The United States Supreme Court observed that the Ninth Circuit majority had divided these facts into two categories: "In the first category, the majority placed facts describing 'ongoing criminal activity,' such as the use of an alias, or evasive movement through an airport; the majority believed that at least one such factor was always needed to support a finding of reasonable suspicion. [Citation.] In the second category, it placed facts describing 'personal characteristics' of drug couriers, such as the cash payment for tickets, a short trip to a major source city for drugs, nervousness, type of attire, and unchecked luggage. [Citation.] The majority believed that such characteristics 'shared by drug couriers and the public at

large,' were only relevant if there was evidence of ongoing criminal behavior and the Government offered '[e]mpirical documentation' that the combination of facts at issue did not describe the behavior of 'significant numbers of innocent persons.' [Citation.] Applying this two-part test to the facts of this case, the majority found that there was no evidence of ongoing criminal behavior, and thus that the agents' stop was impermissible." (*United States* v. *Sokolow, supra,* 490 U.S. at p. 6 [104 L.Ed.2d at p. 9].)

The United States Supreme Court reversed the Ninth Circuit in *Sokolow,* stating: "We think the Court of Appeals' effort to refine and elaborate the requirements of 'reasonable suspicion' in this case creates unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment. In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.' " (*United States* v. *Sokolow, supra,* 490 U.S. 1, 7-8 [104 L.Ed.2d 1, 10].) Describing the appellate court's approach as inappropriately drawing a "sharp line" between indistinguishable types of evidence, the high court stressed that " 'there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot.' " (*Id.* at pp. 8, 9 [104 L.Ed.2d at p. 11], quoting *Reid* v. *Georgia* (1980) 448 U.S. 438, 441 [65 L.Ed.2d 890, 894-895, 100 S.Ct. 2752].)

As these two decisions of the United States Supreme Court illustrate, fashioning a "bright-line" rule applicable to all investigatory stops would violate the high court's directive that police officers on the street, and the courts that evaluate the officers' conduct, consider "the totality of the circumstances—the whole picture" to determine whether a particular intrusion by police was justified. Any temporary detention includes factors that, considered together, may suggest either criminal or innocent behavior to trained police officers. No single fact—for instance, flight from approaching police—can be indicative in *all* detention cases of involvement in criminal conduct. Time, locality, lighting conditions, and an area's reputation for criminal activity all give meaning to a particular act of flight, and may or may not suggest to a trained officer that the fleeing person is involved in criminal activity. Consequently, a "bright-line" rule applicable to all investigatory stops, as the Attorney General asks us to adopt, would be improper.[3]

---

[3]In his brief, the Attorney General refers to a comment that appears in *California* v. *Hodari D.* (1991) 499 U.S. 621, 623, footnote 1 [113 L.Ed.2d 690, 695-696, 111 S.Ct. 1547, 1549]. In *Hodari,* the United States Supreme Court held that no seizure implicating the Fourth Amendment occurs when police chase a fleeing suspect who does not yield. In that case, the Attorney General had conceded that the police lacked the necessary reasonable suspicion to justify a seizure, and that therefore if the high court decided that by chasing Hodari the police had seized him, there would have to be suppression of the rock of crack cocaine Hodari tossed

## VI

██ We now consider whether in this case all the facts known to Officer Stackhouse justified his temporary detention of defendant when the latter fled upon encountering the patrol car. In assessing the sufficiency of these facts, we heed the United States Supreme Court's admonition that the evidence relied on by police officers to justify the seizure of a person "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." (*United States* v. *Cortez, supra*, 449 U.S. 411, 418 [66 L.Ed.2d 621, 629].)

At approximately 3 a.m., Officer Stackhouse was on patrol in a residential area he described as a "high crime area." In almost complete darkness, two people stood near a parked car. One of the two (defendant) leaned toward the car as if talking to someone inside. When Officer Stackhouse directed his patrol car's spotlight into the car's interior, two people in the front seat immediately bent down toward the floorboard, and defendant took off running. From these circumstances—the area's reputation for criminal activity, the presence of two people near a parked car very late at night and in total darkness, and evasive conduct not only by defendant but by the two occupants of the parked car—Officer Stackhouse reasonably suspected that criminal activity was afoot.

██ An area's reputation for criminal activity is an appropriate consideration in assessing whether an investigative detention is reasonable under the Fourth Amendment. (*United States* v. *Sharpe, supra*, 470 U.S. 675, 682-683, fn. 3 [84 L.Ed.2d 605, 613]; *People* v. *Nonnette* (1990) 221 Cal.App.3d 659, 668 [271 Cal.Rptr. 329] [distinguishing federal standards applicable after Proposition 8 from the traditional skepticism of the "high crime factor" expressed in decisions applying the California Constitution]; see also *United*

during the chase and the drug dealing paraphernalia found on him. Addressing that concession, the opinion authored by Justice Scalia and joined by six other members of the Court stated at page 623 in footnote 1: "California conceded below that Officer Pertoso did not have the 'reasonable suspicion' required to justify stopping Hodari, see *Terry* v. *Ohio*, 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968). That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense. See Proverbs 28:1 ('The wicked flee when no man pursueth'). We do not decide that point here, but rely entirely on the State's concession."

We do not view this comment as an abandonment by the United States Supreme Court of the "totality of the circumstances" evaluation for reasonable cause to detain that the court has embraced in previous cases. Rather, the high court's comment must be read in light of the other facts known to the officers in that case and recognizable to them as a drug sale in progress: four or five youths huddled around a car parked at the curb in an Oakland area known for drug dealing scattered in panic at the approach of police officers, and the car then took off at a high rate of speed.

*States* v. *Rickus* (3d Cir. 1984) 737 F.2d 360, 365.) As the Court of Appeal aptly observed in *People* v. *Holloway* (1985) 176 Cal.App.3d 150, 155 [221 Cal.Rptr. 394], "it may be fairly said that our entire nation is a high crime area," particularly with respect to drug-related crimes. Unfortunately, this sad state of affairs has seen little improvement in the intervening decade since *Holloway* was decided. As *Holloway* noted, mere presence in a high-crime area is not, standing alone, "sufficient to justify interference with an otherwise innocent-appearing citizen. . . . Nevertheless, it would be the height of naivete not to recognize that the frequency and intensity of these sorry conditions are greater in certain quarters than in others. Consequently, we must allow those we hire to maintain our peace as well as to apprehend criminals after the fact, to give appropriate consideration to their surroundings and to draw rational inferences therefrom, unless we are prepared to insist that they cease to exercise their senses and their reasoning abilities the moment they venture forth on patrol." (*Ibid.*, citation omitted.)

■ The time of night is another pertinent factor in assessing the validity of a detention. Here, the incident occurred at 3 a.m. As the court in *People* v. *Holloway, supra,* 176 Cal.App.3d 150, 155 observed, "Three a.m., . . . is both a late and an unusual hour for anyone to be in attendance at an outdoor social gathering . . . ." At that late hour defendant and his companion were standing in almost total darkness on a sidewalk next to a car parked in a residential area. These facts led Officer Stackhouse to suspect that an auto burglary might be progress. That suspicion was reasonable. According to the United States Department of Justice, more than 70 percent of thefts involving motor vehicles take place between 6 p.m. and 6 a.m., and the majority of these occur after midnight. (Sourcebook of Criminal Justice Statistics (1991) p. 263.) Frequently, these thefts take place "just outside victims' homes." (Clark & Harris, *Auto Theft and Its Prevention*, in 16 Crime and Justice, A Review of Research (Tonry, edit. 1992) p. 17.)

When in the course of investigating what he thought to be an auto burglary in progress, Officer Stackhouse directed his patrol car's spotlight toward the parked Ford, the car's occupants immediately bent down, and defendant fled. These evasive actions added support to the officer's suspicion that criminal activity was afoot, and that defendant was involved in that activity.

On similar facts, the Supreme Judicial Court of Massachusetts recently upheld a detention. (*Commonwealth* v. *Moses* (1990) 408 Mass. 136 [557 N.E.2d 14].) In that case, the defendant was an occupant of a Mercury automobile that, at 5:45 p.m., was idling at a curb near four men, two of whom appeared to be looking into the car. When Boston police officers in a

marked cruiser approached the Mercury, the men on the sidewalk ran into a nearby housing project, and the defendant "ducked" under the car's dashboard. The Massachusetts court found these facts sufficient to justify the officers' suspicion that the defendant was engaged in criminal conduct, most likely a drug transaction. (*Id.*, 557 N.E.2d at pp. 15, 19.)

In summary, in this case the presence on the sidewalk at 3 a.m. of two people who appeared to be talking to the occupants of a car parked in total darkness in an area that Officer Stackhouse described as a "high crime area," coupled with the evasive conduct by the occupants and defendant's sudden flight when Officer Stackhouse directed his patrol car's spotlight toward the group, justified a brief, investigative detention to enable the officer to resolve the ambiguity in the situation and to find out whether the activity was in fact legal or illegal. (*In re Tony C., supra,* 21 Cal.3d at p. 894.) In concluding to the contrary, the Court of Appeal erred. The court accorded no significance whatsoever to defendant's flight from police, failing to evaluate it against the backdrop of all of the facts known to the officer and failing to apply the "totality of the circumstances" test that the United States Supreme Court has enunciated in assessing the validity of a temporary detention.

The judgment of the Court of Appeal is reversed.

Lucas, C. J. Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

**MOSK, J.,** Concurring.—I agree with the result and much of the reasoning of the majority. I write separately to express disagreement on one particular point.

The majority wisely decline to adopt a "bright-line" rule that flight alone justifies a temporary detention by the police. Instead, they endorse a totality-of-the-circumstances test, in which flight can be considered among other factors in determining whether the police possessed "reasonable suspicion" to initiate a temporary detention.

But the majority seem to retreat from this fact-specific inquiry into reasonable suspicion when they state categorically: "There is an appreciable difference between declining to answer a police officer's questions during a street encounter and fleeing at the first sight of a uniformed police officer. Because the latter shows not only unwillingness to partake in questioning but also unwillingness to be observed and possibly identified, it is a much stronger indicator of consciousness of guilt." (Maj. opn., *ante*, at pp. 234-235.)

I believe this point is considerably overstated. As the majority concede, an individual may have quite innocent motives for avoiding the police. This avoidance may sometimes take the form of quick, rather than slow, flight—of running rather than walking—particularly when the police are known to pursue those who decline to allow themselves to be voluntarily detained.

An example of such potentially innocent flight may be found in *People* v. *Aldridge* (1984) 35 Cal.3d 473 [198 Cal.Rptr. 538, 674 P.2d 240] (*Aldridge*). However one may read *Aldridge*'s reliance on state rather than federal constitutional grounds, our opinion in that case is wholly consistent with the totality-of-the-circumstances approach the majority adopt today. In *Aldridge*, the officer in question testified to his practice of routinely detaining every person he found in a particular liquor store parking lot, the site of frequent drug transactions. On the night of defendant's arrest, the officer and his partner saw defendant and some other men first walk, then run, away from them as they approached in a marked patrol car. This flight eventually led to defendant's detention and to the discovery of a stolen weapon on his person. (*Id.* at p. 476.)

In holding the detention to be unlawful, we stressed the contextual nature of the inquiry: "Under different circumstances, such flight might imply a consciousness of guilt, and combined with other objective factors could justify an investigative stop. Here, however, [the police officer] admittedly intended to follow his routine practice to make an indiscriminate investigative detention of all persons on the lot. The record reveals that defendant had previously been detained and interviewed by [the officer] on Dr. J's lot, and it can be safely assumed that he knew what was in store for him if he were to remain. Defendant had every right to avoid such persistent harassment." (35 Cal.3d at p. 479.)

*Aldridge* illustrates the unfortunate reality that some individuals in our society, often members of minority groups, improperly view the police more as sources of harassment than of protection. These individuals may innocently flee at the first sight of police in order to avoid an encounter that their experience has taught them might be troublesome.

Although this case and *Aldridge* reach opposite results, they do so not because of doctrinal disagreement, but because of factual dissimilarities. There is an important difference between observing a group of men in a liquor store parking lot at 10:15 p.m., as was the case in *Aldridge* (35 Cal.3d at p. 476), and observing a gathering on a residential street at 3 a.m., as in this case. While the former situation is "neither unusual nor suspicious" (*id.*

at p. 478), the latter may be both. Significant also is the fact that in this case, unlike *Aldridge*, no pattern of police harassment has been established. These circumstances, together with defendant's flight from the police, legitimately justify the temporary detention at issue here.

Thus, without agreeing that an individual's flight at the sight of a police officer invariably constitutes "a much stronger indicator of consciousness of guilt," I nonetheless agree that, in this case, the totality of the circumstances supported defendant's "pat-down" search.

Appellant's petition for a rehearing was denied March 16, 1995.