Filed 2/18/15  In re Noah R. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re NOAH R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> NOAH R., <br><br> Defendant and Appellant. | G049514 <br><br> (Super. Ct. No. DL044787) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Cheryl L. Leininger, Judge.  Reversed.

Wayne C. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

# I.

## Introduction

A wardship petition alleged in count 1 that Noah R. (the Minor) violated Penal Code section 452, subdivision (d) by unlawfully setting a fire at a Lamps Plus store on April 21, 2013 and alleged in count 2 that the Minor violated the same Penal Code section by unlawfully setting a fire at a Lamps Plus store on April 14, 2013. Pursuant to Welfare and Institutions Code section 700.1, the Minor moved to suppress evidence obtained from a search of his backpack and admissions he made to a police officer.

After the juvenile court denied the motion to suppress evidence and admissions, the Minor admitted both counts of the wardship petition. The court declared the Minor to be a ward of the court and placed him on probation with various terms and conditions. In this appeal from the dispositional order, the Minor challenges the juvenile court's order denying his motion to suppress evidence.

We reverse the dispositional order. It is undisputed the police officer searched the Minor's backpack without a warrant, based on the Minor's consent. But when the Minor gave his consent to the search of the backpack and made admissions to the police officer, the Minor had been unlawfully detained, and consent that is the product of an unlawful detention is not effective. (*People v. Zamudio* (2008) 43 Cal.4th 327, 341-342 (*Zamudio*).) As we shall explain, no reasonable person in the Minor's situation, and certainly not a 13-year-old youth, would have believed he or she could have denied the officer's request to search the backpack and walked away. Nor were there specific and articulable facts to justify an investigative stop or detention of the Minor.

# II.

## Facts

The only evidence presented at the suppression hearing was the testimony of Brea Police Officer Glenn Eastman. He testified that on April 14, 2013, at about

2

3:40 p.m., he and several other police officers were dispatched to the parking lot of a Lamps Plus store to investigate a dumpster fire. The investigation yielded no information. On that same day, another fire had been reported at a nearby church.

On April 21, 2013, at about 3:40 p.m., Eastman and two other police officers were dispatched to the parking lot of the same Lamps Plus store to investigate another dumpster fire. Footage from a security camera behind an adjacent "99 Cent store" did not provide any information. Eastman went to a gym at the far west end of the parking lot because a door of the gym was open and he believed someone inside might have seen who set the fire. He spoke with two people inside the gym, but they could provide no information.

Soon thereafter, Eastman encountered the Minor on the sidewalk at the far west end of the Lamps Plus store's parking lot. Eastman asked the Minor "where he was coming from," and the Minor responded he had just come from the 99 Cent store, where he had bought ice cream. Eastman told the Minor, "we had a dumpster fire" and asked if he had seen anybody in or around the area. The Minor said he had not. The conversation ended. Eastman continued patrolling the area and the Minor walked southbound.

Eastman joined another officer in an undercover police car at the church where the fire had been set a week earlier. When that investigation was ended, Eastman drove his patrol car down Brea Boulevard. While stopped at a traffic light, Eastman saw the Minor standing on the sidewalk of Elm Street and facing northward. The Minor turned to his left, saw Eastman, immediately turned to his right, and walked into the driveway of the "Brea Complex."

Eastman drove into the same driveway, parked, got out of his patrol car, and walked westbound through a breezeway leading back to Brea Boulevard. Eastman saw the Minor again. The Minor was 150 to 200 yards from the church parking lot and about one-half mile from the spot where Eastman had spoken to him earlier. Eastman testified: "It was odd, in my opinion, that I had seen him prior at the scene of the fire and

3

then in an area where we had fires in the past, which met the same criteria or circumstances as the first fires the week prior as well as the one that week on the 21st. As well as the eye contact immediately turning the opposite direction and then walking into the parking lot."

Eastman followed the Minor through the breezeway and onto a sidewalk. When the Minor was about 10 yards in front of Eastman, he asked the Minor if he was the "gentleman" or "kid" with whom Eastman had spoken earlier at the 99 Cent store. The Minor turned around, stopped, and said he was. Eastman, who did not have a weapon drawn, told the Minor to walk back to where Eastman was standing. The Minor complied, and Eastman then resumed questioning him about the fires. Eastman asked if the Minor knew anything about the fires. He answered, "no." Eastman asked if the Minor had anything illegal, or any matches or lighters, and he answered, "no." Eastman asked if the Minor had anything in his backpack, and he again answered, "no." The Minor was cooperative and did not appear unusually nervous.

Eastman asked the Minor to open his backpack. In response, the Minor unzipped the backpack's large wraparound zipper. Eastman looked inside and saw only a blue, three-ring binder. He believed it was odd for the Minor to be carrying a backpack and binder on a Sunday and asked him why he had those items. The Minor said he had "just come from home from writing a paper." Eastman again asked the Minor if he knew anything about the fires or had seen anything, and the Minor again replied, "no."

At that point, Eastman asked the Minor to open the small front pocket of the backpack. The Minor cooperated, and Eastman saw a large box of matches inside the pocket. When he saw the matches, Eastman told the Minor he was being detained and took the backpack from him on the ground he was in violation of Penal Code section 308, subdivision (b).

Brea Police Sergeant Dickinson arrived and talked to the Minor, who was now sitting on the sidewalk, while Eastman searched the backpack. Eastman moved the

4

binder and discovered a large inside pocket, in which he found a bottle of nail polish remover and lighter fluid. Eastman again asked the Minor if he knew anything about the fires and told him, "it was [a] little suspicious that we had seen him at both locations, that he had those materials on him." The Minor at first said he had no idea who started the fires. After some "back and forth," the Minor admitted starting the fire on April 21 but denied having anything to do with the fires on April 14. After some more "back and forth," the Minor admitted starting the fire at the Lamps Plus store on April 14 but denied having anything to do with the fire at the church. Eastman read the Minor his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436.

The Minor sought to suppress evidence obtained from the search of his backpack, including the nail polish remover, matches, and lighter fluid, and to suppress his admissions made to Eastman. The juvenile court denied the motion to suppress, stating, "I do find it was a consensual encounter and consensual search."

## III.

### The Minor's Consent to the Search of the Backpack Was Ineffective Because He Had Been Illegally Detained.

The Minor argues the juvenile court erred by denying his motion to suppress because the evidence established he had been unlawfully detained at the time Eastman asked him to open the front pocket of his backpack, where the box of matches was found. The Minor argues his consent to search his backpack was therefore ineffective.

A.

*Standard of Review*

Consent that is the product of an illegal detention is not voluntary and is ineffective to justify a search or seizure unless subsequent events adequately dispel the coercive taint. (*Zamudio*, *supra*, 43 Cal.4th at p. 341.) In determining whether a

5

detention has occurred within the meaning of the Fourth Amendment to the United States Constitution, we review the trial court's findings of historical fact under the substantial evidence standard and independently apply constitutional standards to those facts. (*Zamudio*, *supra*, at p. 342.)  We draw all factual inferences in favor of the trial court's ruling and accept the trial court's resolution of disputed facts and evaluations of credibility.  (*Ibid.*)

## B.

### *The Minor Was Detained When He Gave His Consent.*

Police contact with members of the public can be placed into three broad categories:  (1) "consensual encounters that result in no restraint of liberty whatsoever"; (2) "detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose"; and (3) "formal arrests or comparable restraints on an individual's liberty."  (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)  "Consensual encounters do not trigger Fourth Amendment scrutiny[,] . . . [and,] "[u]nlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime." (*Ibid.*, citation omitted.)

The "threshold issue" is whether the Minor was detained or seized when he gave his consent to Eastman to look in the front pocket of his backpack.  (*Zamudio*, *supra*, 43 Cal.4th at p. 341.)  A detention or seizure occurs when the officer, by means of physical force or show of authority, intentionally restrains a person's freedom of movement.  (*Ibid.*)  Although a number of circumstances have been identified to consider in making the determination whether a detention or seizure occurred,[1] the ultimate

---

[1]  "Circumstances establishing a seizure might include any of the following:  the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled.  [Citations.]  The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing

question considering all of the circumstances surrounding the encounter, is whether a reasonable person would believe he or she was free to disregard the officer's requests or to terminate the encounter and leave. (*Zamudio*, *supra*, at p. 341; *In re Manuel G.*, *supra*, 16 Cal.4th at p. 821 ["As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer."].) The test is objective and looks to "'the intent of the police as objectively manifested'" to the person encountered. (*Zamudio*, *supra*, at p. 341.)

When the Minor gave Eastman consent to search the backpack, would a reasonable person have believed he or she was free to decline Eastman's request, terminate the encounter, and leave? Under the facts established at the suppression hearing, no reasonable person, and certainly not a 13-year-old youth, would have believed he or she could have refused to let Eastman search the backpack.

The Minor encountered Eastman twice. The first time was near the parking lot of the Lamps Plus store. Eastman asked the Minor about the fire, and the Minor denied any knowledge of it. The encounter ended, and the Minor went his way. This first encounter was consensual.

But what began as a consensual encounter was transformed into a detention by the time of the second encounter. It is significant that the second encounter between Eastman and the Minor was not by chance. When the Minor was standing on the sidewalk of Elm Street, he glanced and saw Eastman in his patrol car. The Minor turned and walked in a different direction but soon heard Eastman, who was on foot about 10 yards behind the Minor, ask him if he was the same person Eastman had spoken with earlier at the 99 Cent store. It would have been clear to a reasonable person, based on objective factors, that Eastman had been following the Minor and possibly suspected him

whether a seizure triggering Fourth Amendment scrutiny has occurred. [Citation.]" (*In re Manuel G.*, *supra*, 16 Cal.4th at p. 821.)

7

of having committed a crime. The Minor turned around, stopped, and said he was. Eastman told the Minor to walk back to where Eastman was standing. Asking the Minor to approach Eastman did not in itself create a detention (*In re J.G.* (2014) 228 Cal.App.4th 402, 412), but the request came after Eastman had already once questioned the Minor and after the objective circumstances established Eastman had been following the Minor on foot. Although Eastman testified he did not raise his voice and did not have a weapon drawn, no reasonable person in contemporary America would believe Eastman's request could be disobeyed without consequences. As our colleague has asked, "how does one exercise one's right to decline a conversation with a police officer without assisting the officer in establishing reasonable suspicion?" (*People v. Perrusquia* (2007) 150 Cal.App.4th 228, 236 (conc. opn. of O'Leary, J.) (*Perrusquia*).)

After the Minor approached Eastman, he again questioned the Minor about the fires. The Minor again denied any knowledge. Eastman did not terminate the encounter, but continued to press the Minor for information. When the Minor opened his backpack, Eastman questioned why he was carrying a backpack and a binder. The Minor replied he had been doing homework. Eastman did not accept that response and again asked the Minor if he knew anything about the fires, and the Minor again said no. The questioning was not directly accusatory; however, the fact the questions were the same as previously asked during the first encounter, Eastman's persistent refusal to accept the Minor's "no" answers, and Eastman's questioning why the Minor carried a backpack containing a blue binder, would leave no doubt in a reasonable person's mind that Eastman was highly suspicious that the Minor had set the dumpster fires. "[Q]uestions of a sufficiently accusatory nature may by themselves be cause to view an encounter as a nonconsensual detention[,] . . . and the degree of suspicion expressed by the police is an important factor in determining whether a consensual encounter has ripened into a detention." (*People v. Lopez* (1989) 212 Cal.App.3d 289, 292-293, citation omitted.)

At that point, Eastman requested to look inside the front zippered pocket of the Minor's backpack. A reasonable person would not believe he or she could deny the request; indeed, had the Minor refused to comply and walked away, his conduct could have been used to justify a detention on the ground he was being evasive. (See, e.g., *People v. Souza* (1994) 9 Cal.4th 224, 235-239, 241.)

In particular, a 13 year old, undoubtedly taught in school to respect and obey law enforcement officers, would not feel free to disregard a request made by a uniformed and armed police officer. In *J. D. B. v. North Carolina* (2011) 564 U.S. __ [131 S.Ct. 2394] (*J .D. B.*), the United States Supreme Court held a child's age "properly informs" the custody analysis under *Miranda v. Arizona*, *supra*, 384 U.S. 436 (*J .D. B.*, *supra*, at p. __ [131 S.Ct. at pp. 2398-2399]), "[s]o long as the child's age was known to the officer at the time of the interview, or would have been objectively apparent to any reasonable officer" (*id.* at p. __ [131 S.Ct. at p. 2404]). In *J .D. B.*, the Supreme Court noted that "[i]n some circumstances, a child's age 'would have affected how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave.' [Citation.]" (*Id.* at p. __ [131 S.Ct. at pp. 2402-2403].) That is because, the court explained, children are generally less mature and responsible than adults, often lack the experience and judgment to recognize and avoid detrimental choices, and are more susceptible to outside pressure than adults. (*Id.* at p. __ [131 S.Ct. at p. 2403].) The law historically has assumed children lack the capacity to "exercise mature judgment" (*id.* at p. __ [131 S.Ct. at p. 2403]), and, "even where a 'reasonable person' standard otherwise applies, the common law has reflected the reality that children are not adults" (*id.* at p. __ [131 S.Ct. at p. 2404].)

Although this is a Fourth Amendment case, and not a Fifth Amendment case, the reasoning of *J. D. B.* applies just as forcefully to Fourth Amendment detention analysis. In *In re J.G.*, *supra*, 228 Cal.App.4th at page 410, the Court of Appeal examined *J. D. B.* in the context of a Fourth Amendment detention and stated: "*J. D. B.*'s

holding—that a juvenile's age is a factor in the reasonable-person analysis of Fifth Amendment custody—may implicate 'other areas of criminal procedure—including voluntariness of waivers of rights and seizure inquiries' as well as areas of substantive criminal law, such as 'blameworthiness of [the subject's] conduct and/or state of mind.' [Citation.] The holding seems particularly fitting for search-and-seizure analyses since the tests for custody under the Fifth Amendment and detentions under the Fourth Amendment both focus on how reasonable persons would perceive their interaction with the police." The Court of Appeal "recognize[d] the strength of the argument that *J. D. B.*'s holding should be extended to Fourth Amendment custody determinations," but did not resolve the issue because it concluded the juvenile defendant had been illegally detained regardless of his age. (*Id.* at p. 411.)

Here, the record shows that Eastman knew, at the time of the encounters, the Minor was a youth, having referred to him as "kid." We cannot "blind [our]selves to a juvenile defendant's age" (*J. D. B.*, *supra*, 564 U.S. at p. __ [131 S.Ct. at p. 2406]) and "[n]either officers nor courts can reasonably evaluate the effect of objective circumstances that, by their nature, are specific to children without accounting for the age of the child subjected to those circumstances" (*id.* at p. __ [131 S.Ct. at p. 2405]). We conclude the Minor's consent to search the backpack was the product of a warrantless detention. We turn to the question whether the second encounter between Eastman and the Minor was justified as an investigative stop or detention.

C.

*The Minor's Detention Was Illegal.*

Eastman's detention of the Minor and search of his backpack was lawful if, under the circumstances, Eastman had a reasonable suspicion the Minor had committed, or was about to commit, a crime. An investigative stop or detention is justified if the circumstances known or apparent to the officer include "specific and articulable facts"

10

causing the officer to suspect that "(1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person [the officer] intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893, superseded on other grounds in Cal. Const., art. I, § 28.) "The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith." (*In re Tony C.*, *supra*, at p. 893, citing *Terry v. Ohio* (1968) 392 U.S. 1, 22.)

We consider "'the totality of the circumstances'" of the case to determine whether Eastman had a "'particularized and objective basis' for suspecting legal wrongdoing.'" (*United States v. Arvizu* (2002) 534 U.S. 266, 273.) The Attorney General argues Eastman was justified in detaining the Minor based on these three facts: (1) the Minor was present "at the scene" of the Lamps Plus store fire when Eastman first spoke with him; (2) an hour later, the Minor was near the scene of the church fire; and (3) when the Minor saw Eastman in the patrol car, the Minor "deliberately tried to avoid contact with Officer Eastman."

Considering those facts as a whole, we conclude there were not specific and articulable facts to justify the Minor's detention. When Eastman first encountered the Minor, he was on a sidewalk at the far west end of the Lamps Plus store's parking lot and was walking from a 99 Cent store. Other than proximity to the dumpster, there was nothing to link the Minor to the fire. The next time Eastman saw the Minor he was about a half mile away, along Brea Boulevard, a busy street. The Minor was 150 to 200 yards from the church, but so presumably were other people on a Sunday, and the church fire had been reported a week earlier. The Minor had never been seen at the church. Eastman and another officer had just completed an undercover surveillance of the church, apparently with no results.

The Minor, after seeing Eastman in the patrol car on Brea Boulevard, turned and walked in the opposite direction. Eastman believed such behavior was "odd,"

11

but a hunch is not a lawful basis for a detention.[2]  Flight or evasive action upon encountering a uniformed police officer or a patrol car is a consideration, but only in combination with other factors, and in itself cannot justify a detention.  (*People v. Souza*, *supra*, 9 Cal.4th at pp. 235-239, 241.)  In *People v. Souza*, the defendant was seen at 3:00 a.m., in a high crime area, leaning toward a parked car as if talking to someone inside.  (*Id.* at p. 240.)  When the police officer directed his patrol car's spotlight into the car's interior, two people in the front seat bent down toward the floorboard and the defendant took off running.  (*Ibid.*)  The court concluded, "[f]rom these circumstances— the area's reputation for criminal activity, the presence of two people near a parked car very late at night and in total darkness, and evasive conduct not only by defendant but by the two occupants of the parked car—[the police officer] reasonably suspected that criminal activity was afoot."  (*Ibid.*)

In contrast to *People v. Souza*, the circumstances in this case—the Minor's presence on a sidewalk near the Lamps Plus store and presence later on Brea Boulevard not far from the church where a fire had occurred a week earlier—are not sufficient to make the Minor's evasive conduct meaningful in determining whether a lawful detention occurred.  Moreover, many reasonable people, guiltless of any offense, might have good reason for not wanting to have contact with law enforcement.  (*People v. Souza*, *supra*, 9 Cal.4th at p. 243 (conc. opn. of Mosk, J.) ["an individual may have quite innocent motives for avoiding the police"].)

The Minor argues *Perrusquia*, *supra*, 150 Cal.App.4th 228, is similar.  In that case, Police Officer Ryan Tisdale was on patrol in a high crime area of Anaheim in which six convenient stores recently had been robbed.  (*Id.* at pp. 230-231.)  A suspect had been described as a Black or Hispanic male in his late 20's.  (*Ibid.*)  At about 11:26 p.m., as Tisdale drove into the parking lot of a convenience store, he noticed the

---

[2]  On cross-examination, Eastman testified the only reason he asked the Minor to come speak with him was because Eastman recognized the Minor from the first encounter.

12

defendant's car parked next to the exit. (*Id.* at p. 231.) The car caught Tisdale's attention because other parking spots were closer to the store's entrance, someone was inside the car, and its engine was idling. (*Ibid.*) Tisdale stood behind the car and saw the defendant, who was crouched low in the driver's seat and leaning against the glass. (*Ibid.*) Another officer arrived, and, after seeing that the defendant had not moved, the two officers began to approach the car. (*Ibid.*) As they reached the rear of the car, Tisdale heard what sounded like "'a fumbling'" and what sounded like something dropping to the floor with a "'thud.'" (*Ibid.*) Tisdale saw the defendant look at him in the car's side mirror, at which point the defendant turned off the car's engine, got out of the car, and "'aggressively, quickly'" tried to pass Tisdale. (*Ibid.*) The defendant was wearing baggy jeans, and an untucked, long-sleeved baggy shirt. (*Ibid.*) At that moment, Tisdale asked the defendant what was going on, to which the defendant replied that he was going to the store. (*Id.* at pp. 231, 234.) At that moment, Tisdale asked the defendant to "'hang on a second.'" (*Ibid.*)

The Court of Appeal concluded, based on those facts, the officers did not have a reasonable suspicion to detain the defendant at that moment. (*Perrusquia*, *supra*, 150 Cal.App.4th at p. 234.) "[Tisdale] had a hunch that something was amiss with defendant, and he turned out to be right. That he was right, however, cannot be used to retroactively justify a detention." (*Ibid.*)

The facts supporting reasonable suspicion in this case are weaker than those found to be insufficient in *Perrusquia*. Here, unlike *Perrusquia*, the Minor was seen in broad daylight, no evidence was presented that he was in a high crime area, he was not wearing suspicious clothing, and he did not run or try to get away quickly. The facts known to Eastman amounted to a hunch that the Minor had set the dumpster fires. Although that hunch turned out to be correct, it did not justify an investigative stop or detention.

13

## IV.

### Disposition

The dispositional order is reversed.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.