Filed 8/15/14  P. v. Brown CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>STEVEN BROWN,<br><br>  Defendant and Appellant. | D064372<br><br><br>(Super. Ct. No. SCD245750) |


APPEAL from a judgment of the Superior Court of San Diego County, Eugenia Eyherabide, Judge.  Affirmed.

Joshua H. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alastair J. Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

Steven Brown was charged with one count of attempting to transport more than 28.5 grams of marijuana (Health & Saf. Code, § 11360, subd. (a)), and it was alleged the

attempted transport was not for personal use (Pen. Code, § 1210, subd.(a)). After the magistrate denied his Penal Code section 1538.5 motion to suppress evidence, and the trial court denied his renewed motion to suppress, he pleaded guilty to the charge and allegation. On appeal, Brown argues his motion to suppress should have been granted because he was unlawfully detained, and his subsequent consent to a search was the fruit of the unlawful detention.

I

TRIAL COURT PROCEEDINGS ON MOTION TO SUPPRESS

Brown moved to suppress the evidence obtained when he was stopped by the authorities outside a Postal Annex store after he delivered a box for mailing at the store.

A. Evidence Relevant to Motion to Suppress

The testimony at the preliminary hearing, which served as the factual showing for Brown's motions to suppress, showed that on January 18, 2013, San Diego County Deputy Sheriff Stein, along with United States Drug Enforcement Agency Special Agents Wells and Beauchamp, was watching a Postal Annex in Lemon Grove, California, as part of an undercover narcotics interdiction operation. This Postal Annex was located in a "high narcotics area," and drug traffickers had previously used this Postal Annex to ship narcotics around the country. Stein had seen narcotics-related activity at this particular Postal Annex at least a "couple [of] dozen times" during the previous year.

Stein, Wells and Beauchamp were wearing civilian clothes and driving separate, unmarked cars. Around 1:30 p.m., they arrived and parked across the street from the strip mall in which the Postal Annex was located. Around 3:00 p.m., Stein saw Brown

2

drive into the parking lot for the strip mall. Another person was sitting in the front passenger's seat. Although there were open parking spaces directly in front of the Postal Annex, Brown parked in a space approximately 40 feet west of the entrance to the Postal Annex. Stein testified drug traffickers prefer to park at a distance from the shipping location, rather than in front of it, to avoid detection. Stein also explained that drug traffickers who use commercial shipping facilities like Postal Annex prefer to deliver packages later in the day, close to 4:00 p.m., because mail carriers collect packages for shipping around that time and, by leaving packages close to the normal collection time, the traffickers avoid having the package "sitting around for long periods of time," exposed to scrutiny.

Stein observed Brown get out of his car, using both hands to carry a 12 inch by 12 inch cardboard box that appeared to be "heavily taped," and walk from his car to the Postal Annex. Stein explained packages containing narcotics are often heavily taped to avoid detection by law enforcement or deter "alerting on the package" by dogs. When he saw Brown enter the Postal Annex, Stein radioed Wells and Beauchamp and stated, "Hey, look at that guy walking up with the box . . . . [¶] . . . [¶] . . . Let's take a look at this guy." Stein then drove into the parking lot, parked, and went into the Postal Annex. Stein watched as Brown told the clerk the box was going to Chicago.[1] Brown gave the box to the store clerk and paid cash to ship the box, which was already prepared for

[1] Stein testified traffickers from San Diego often ship marijuana to Midwest cities such as Chicago because marijuana sells for two to three times more there than on the West Coast.

3

shipping with both a mailing and a return address label affixed to its exterior. Brown then left the store.

After Brown left the store, Stein quickly looked at the box Brown left with the clerk. Stein saw the mailing address was to a Chicago address, and the name on the return address was "Austin Rivers," a well-known professional basketball player. He could not detect the smell of marijuana and did not open the box at that time. After quickly looking at the box, Stein left the Postal Annex and saw Agents Beauchamp and Wells contact Brown. Within a few seconds, Stein made his way to the passenger side of Brown's vehicle and began talking to Brown and the passenger.

Wells saw Brown emerge from the Postal Annex, walk to his car and get into the driver's seat. Beauchamp drove into the lot and parked, then approached Brown's car on foot. She went up to the driver's window and identified herself as law enforcement. Meanwhile, Wells also drove his car into the lot. He stopped his car in the throughway several feet behind Brown's car, blocking Brown from easily backing out of the parking stall. Wells, wearing a badge around his neck, got out of his car and stood near the back of Brown's car while Beauchamp spoke to Brown. Within moments of Beauchamp's initial contact with Brown, Stein emerged from the Postal Annex store and went to the passenger's window of Brown's car.

Stein identified himself as law enforcement to Brown and the passenger, and explained the officers were conducting a narcotics interdiction operation. Brown and the passenger seemed nervous when Stein identified himself as a police officer, and Brown was "stuttering quite a bit" when he spoke to the officers. Stein also noticed an odor of

4

marijuana coming from Brown's car. Stein then asked whether Brown or the passenger were on probation or parole, and both answered no. In fact, Brown was on formal probation, and his terms of probation included a search condition and Fourth Amendment waiver. Stein testified that, if Brown had answered truthfully, Stein would have first confirmed Brown's probation status and then proceeded to search Brown and the box Brown left at the Postal Annex.

Stein then asked what was in the box and Brown replied he was sending clothing to someone. Stein told Brown he did not believe him and instead believed Brown was shipping marijuana, and asked for permission to look inside the box to confirm Brown's claim. Brown said he did not want Stein to look inside the box. After Stein repeated that he and the agents were investigating narcotics activity and asked again for permission to search the box to confirm Brown's claim, and Brown said "go ahead and search it." Less than five minutes elapsed during the course of Stein's conversations with Brown before Brown agreed to the search. Stein searched the box, which contained approximately 13.5 pounds of marijuana.

II

ANALYSIS

A. Standard of Review

" ' "An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established

facts is or is not violated. [Citations.] 'The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review.' [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 255.)

When assessing the first step of determining the historical facts, we must "accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them." (*People v. Zamudio* (2008) 43 Cal.4th 327, 342 (*Zamudio*).) Because Judge Gallagher "heard the evidence, saw the demeanor of witnesses and was in a position to judge credibility" (*People v. Woods* (1993) 12 Cal.App.4th 1139, 1147), we disregard "the superior court ruling and directly examine[] the magistrate's. [Citations.] We . . . must draw every legitimate inference in favor of the magistrate's ruling and cannot substitute our judgment, on the credibility or weight of the evidence, for that of the magistrate." (*Id.* at pp. 1147-1148.)

B. Relevant Substantive Framework

In *In re James D.* (1987) 43 Cal.3d 903, our Supreme Court, quoting at length from United States Supreme Court's decision in *Florida v. Royer* (1983) 460 U.S. 491, delineated the different types of police contacts with citizens ranging from the least to the

6

most intrusive. " 'First, there are . . . "consensual encounters" [citation], which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever . . . and which may properly be initiated by police officers even if they lack any "objective justification." [Citation.] Second, there are what are commonly termed "detentions," seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police "if there is an articulable suspicion that a person has committed or is about to commit a crime." [Citation.] Third, and finally, there are those seizures of an individual which exceed the permissible limits of a detention . . . .' " (*In re James D.,* at pp. 911-912.)

There is thus a two-step analysis a court employs to determine whether the fruits of a police stop of a citizen were lawfully obtained: first, did the stop exceed the permissible limits on consensual encounters and become a detention or seizure; and, if so, did police have an adequate basis for conducting the initial detention.

*The Detention Standards*

On the first question, our Supreme Court in *Wilson v. Superior Court* (1983) 34 Cal.3d 777 followed *Royer's* analysis for determining when the line has been crossed between a consensual encounter and a detention. *Royer* involved the detention and arrest of a person who matched a law enforcement "drug courier profile." *Royer* noted "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual . . . in [a] public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . . [Citations.] Nor would the fact that the officer identifies himself as a police officer,

7

without more, convert the encounter into a seizure requiring some level of objective justification." (*Wilson*, at p. 789.) However, *Wilson* also concluded the appropriate test for determining whether a consensual encounter has crossed the line and become a detention, which is permissible only if police have specific and articulable facts generating an objectively reasonable suspicion that the person has committed or is about to commit a crime (see, e.g., *In re Tony C.* (1978) 21 Cal.3d 888, 893), is the standard articulated by Justice Stewart in his separate opinion in *U.S. v. Mendenhall* (1980) 446 U.S. 544: " '[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' [Quoting *U.S. v. Mendenhall,* at p. 554.]" (*Wilson,* at p. 790, fn. omitted.)

A seizure occurs only when the officer, either by means of physical force or by a show of authority, terminates or restrains the person's freedom of movement, and the dispositive question is whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. (*Zamudio, supra,* 43 Cal.4th at p. 341.) The test is objective rather than subjective, and requires an examination of all the circumstances surrounding the encounter to determine "whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." (*Florida v. Bostick* (1991) 501 U.S. 429, 439.) Among the circumstances to be considered are "the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating

8

that compliance with the officer's request might be compelled." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)

*The "Reasonable Suspicion" Standards*

When a stop becomes more than a consensual encounter and constitutes "a seizure requiring some level of objective justification" (*Wilson v. Superior Court, supra*, 34 Cal.3d at p. 789), the court must determine whether police had "specific articulable facts that, considered in light of the totality of the circumstances, provide[d] some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) Although a detention may not be premised on a "mere hunch" (*People v. Durazo* (2004) 124 Cal.App.4th 728, 736), the standard of reasonable suspicion is "less demanding than probable cause 'not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.' " (*Souza,* at pp. 230-231.)

Importantly, when evaluating whether the totality of the circumstances gave rise to an objectively reasonable suspicion, the court must remain cognizant that law enforcement officers are entitled to " 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." [Citations.]' " (*People v. Hernandez* (2008) 45 Cal.4th 295, 299, quoting *U.S. v. Arvizu* (2002) 534 U.S. 266, 273.) Thus, the evidence collected "must be seen and weighed not in terms of library analysis

9

by scholars, but as understood by those versed in the field of law enforcement" (*U.S. v. Cortez* (1981) 449 U.S. 411, 418 [officer may consider "objective observations . . . and consideration of the modes or patterns of operation of certain kinds of lawbreakers"]) because "a trained officer [may] draw[] inferences and make[] deductions . . . that might well elude an untrained person." (*Ibid.*) Moreover, when the objective circumstances are consistent with criminal activity, a temporary detention for investigative purposes is permitted even if the circumstances are also consistent with lawful activity, and "[t]he possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal—to 'enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.' " (*In re Tony C., supra,* 21 Cal.3d at p. 894.)

III

ANALYSIS

A. <u>The Stop Was a Detention</u>

The People contend the stop was a consensual encounter because it involved no restraint on Brown's liberty, and therefore it is unnecessary to examine whether the officers had sufficient objective justification for Brown's detention. Brown contends the stop constituted a detention because, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

10

We first resolve this dispute because resolution in the People's favor would obviate the need to consider the second step in the analysis.

The fact Beauchamp approached the driver's window on foot and identified herself as law enforcement to Brown did not alone escalate the encounter into a detention. (*People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1227.) However, within seconds of Beauchamp's first contact with Brown, Wells had driven his car into the lot and stopped behind Brown's car in a position that blocked Brown from easily backing out of the parking stall, and Stein had also approached the car and positioned himself at the passenger's window. Under these circumstances, we agree that a reasonable person, whose car was flanked on both sides by officers and whose car was blocked from leaving by a third officer's car, would not have felt free to ignore the officers and simply drive away. (See *People v. Wilkins* (1986) 186 Cal.App.3d 804, 809 [occupants of car were "seized" when officer stopped marked vehicle behind parked car in such a way that exit of parked car was prevented because "[u]nder these circumstances, a reasonable person would have believed that he was not free to leave"]; cf., *People v. Castaneda,* at p. 1227 [defendant not detained simply because an officer approached him and began talking to him, but "test is at what point in the conversation would 'a reasonable person [no longer] feel free to leave' "].)

The People assert there was no seizure of Brown because, when the officers approached Brown, they were in plain clothes and driving unmarked vehicles, acted in a "friendly" manner, and the contact was during daylight hours in a public place, all of which persuaded the court in *People v. Sanchez* (1987) 195 Cal.App.3d 42 to find there

11

was no seizure in that case. However, *Sanchez* is distinguishable because the defendant in *Sanchez* was on foot when approached by the officers (*id.* at p. 45), and there was no evidence in *Sanchez* that the officers blocked or impeded the defendant from continuing on his way, whereas here Brown's car was flanked by two officers and blocked in by a third officer's car. The People also suggest Wells' blocking action was irrelevant because, when Wells moved his car into the blocking position, there was no evidence Brown was preparing to leave or was aware that another officer's car had blocked his egress. However, the test for whether a reasonable person would have believed that he was not free to leave is an objective test (*Zamudio, supra,* 43 Cal.4th at p. 341), and "[n]either the officer's uncommunicated state of mind *nor the subjective belief of the individual citizen* is relevant . . . ." (*In re Christopher B.* (1990) 219 Cal.App.3d 455, 460, italics added.) Whether Brown was actually aware Wells had blocked his car from freely backing up is irrelevant. We conclude, under all of the circumstances, Brown was detained when, within moments of sitting in his car and closing the door, his car was flanked on both sides by officers and was blocked from leaving by a third officer's car.

B. The Facts Known to the Officers Justified the Detention

The facts, viewed most favorably to the People (*Zamudio, supra,* 43 Cal.4th at p. 342), showed that by the time Brown was detained, the officers were aware of the following facts: this specific Postal Annex was located in a "high narcotics area" and was used by drug traffickers to ship narcotics to other areas of the country; Brown arrived at a time of day consistent with the time of day drug traffickers elected to deliver their shipments (to purposefully narrow the time window in which the package would sit idle

12

and therefore be subjected to closer scrutiny); Brown declined to park in an open parking stall directly in front of the Postal Annex but instead elected to park 40 feet from the business (consistent with a desire to avoid detection); and, Brown was using both hands to carry a package that appeared from afar to be "heavily taped" (consistent with a desire to avoid detection by police or trained dogs). Brown asserts, based on these facts, the officers could not have had a reasonable suspicion that Brown was doing anything more than shipping a box in the same manner as anyone else would legally ship a box.

Even assuming the foregoing facts would not by themselves have permitted the officers, "draw[ing] on their own experience and specialized training" (*People v. Hernandez, supra,* 45 Cal.4th at p. 299), including "consideration of the modes or patterns of operation of certain kinds of lawbreakers" (*U.S. v. Cortez, supra,* 449 U.S. at p. 418), reasonably to make "make inferences . . . that might well elude an untrained person" (*Hernandez, supra*) that Brown was engaged in wrongdoing, Brown ignores that the facts, viewed most favorably to the People, shows Stein obtained additional facts *before* Brown was detained.[2] By the time Brown was detained, Stein had *also* learned:

---

[2]    Brown was not detained when he left the store, but instead was first approached by Beauchamp (and shortly thereafter by Wells pulling into the parking area), after he got back into his car and closed the door. Stein testified that, as soon as Brown walked outside (i.e. before Brown reached his car and was subsequently detained), Stein inspected the package "quickly [and] exited the store as well," saw agents Beauchamp and Wells contact Brown in the car, and "seconds later I was already outside speaking to both of them as well." Although Brown asserts on appeal that Stein emerged from the store "within 30 seconds" after Beauchamp's initial contact, Stein testified he had made his way to the vehicle five seconds after he saw Brown go to the car. Thus, the facts viewed most favorably to the ruling shows Stein was in possession of all the facts concerning the package *before* Brown was detained.

13

Brown paid the package shipping fees in cash rather than with a credit card (which made Stein suspect the box might contain drugs); the box was relatively heavy[3]; the box was destined for Chicago (consistent with marijuana being moved from the relatively lower-profit market on the West Coast to the much higher-profit markets in the Midwest); and, the pre-prepared label contained what Stein believed to be inaccurate information as to the shipper's identity because the shipper was named as "Austin Rivers," a well known professional basketball player.

Brown appears to assert these additional facts must be disregarded when evaluating whether the facts justified the detention because the officers who made the initial detention (Beauchamp and Wells) were unaware of these additional facts at the time they commenced the detention. However, the reasonable suspicion element may be met based on the collective knowledge of the officers working together: "when police officers work together to build 'collective knowledge' . . . , the important question is not what each officer knew . . . , but how valid and reasonable the probable cause was that developed in the officers' collective knowledge." (*People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1555; accord, *People v. Gomez* (2004) 117 Cal.App.4th 531, 538.) The "collective knowledge" rule, which imputes the knowledge of all of the officers to each other when (as here) they are working together as a team even though the actual facts were not communicated among officers (see, e.g., *U.S. v. Sutton* (9th Cir. 1986) 794

___

3    Stein testified that, immediately after Brown left the Postal Annex, Stein picked up the box and looked at the label. The box, which was only 12 inches by 12 inches, contained 6.38 kilos of marijuana, which means the box weighed no less than 14 pounds.

14

F.2d 1415, 1426 ["We look to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop."]; accord, *U.S. v. Ramirez* (9th Cir. 2007) 473 F.3d 1026, 1032 ["we have been willing to aggregate the facts known to each of the officers involved at least '[w]hen there has been communication among agents' "]), is equally applicable to determining whether investigatory detentions were justified by the facts known collectively to the team of officers. (*U.S. v. Merritt* (10th Cir. 1982) 695 F.2d 1263, 1268 & fn. 9.)

We conclude the collective knowledge of all the officers, as known to them before Brown was detained, must be taken into account in assessing whether, under the totality of the circumstances, the objective circumstances were sufficiently consistent with criminal activity to permit a temporary detention for investigative purposes. We conclude the timing and location of Brown's delivering the package, which appeared to be heavily taped and destined for a place consistent with drug-trafficking patterns, and that contained other indicia of misdirection (its return sender's name) and concealment (payment of the fees in an untraceable manner), justified the initial temporary detention for investigative purposes. Although these circumstances may also have been consistent with lawful activity, "[t]he possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of [such an] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal—to 'enable the police to quickly

15

determine whether they should allow the suspect to go about his business or hold him . . . .' " (*In re Tony C., supra,* 21 Cal.3d at p. 894.)

C. <u>The Subsequent Search of the Package Was Valid</u>

Brown argues the fruits of the search to which he consented, as well as his incriminating statements to officers, must be suppressed. However, the sole basis for Brown's argument is that his consent was involuntary as a matter of law because it was the product of an unlawful detention, and he makes no other argument that his consent was involuntary. Because we have rejected Brown's predicate and concluded the initial detention was not unlawful, and Brown makes no other claim on which his consent to the search might be invalidated, we conclude the search was valid.

## DISPOSITION

The judgment is affirmed.

McDONALD, Acting P. J.

WE CONCUR:

McINTYRE, J.

IRION, J.