Filed 1/14/15  P. v. Ricks CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KENNETH McCARTY RICKS,<br><br>Defendant and Appellant. | F066834<br><br>(Super. Ct. Nos. BF142634A & BF144431A)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  William D. Palmer, Judge.

Monique Q. Boldin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Kane, J. and Franson, J.

## *INTRODUCTION*

This is an appeal from two cases.[1]  On October 25, 2012, the Kern County District Attorney filed an information in case No. BF144431A charging defendant Kenneth McCarty Ricks in count 1 with possessing cocaine base for sale (Health & Saf. Code, § 11351.5) and in count 2 with transporting cocaine base (Health & Saf. Code, § 11352). As to both counts, the information alleged that defendant had been previously convicted of two strike felonies.  (Pen. Code, §§ 667, subds. (c)–(j) & 1170.12, subds. (a)–(e).)[2] Defendant pled not guilty to all counts and denied all allegations.

On November 21, 2012, defendant filed a motion to suppress evidence pursuant to section 1538.5.  The prosecutor filed a written opposition.  On December 11, 2012, the court denied the motion after receiving evidence and listening to oral arguments from both parties.

On December 14, 2012, defendant withdrew his pleas of not guilty and pled no contest to count 1 and admitted the two strike priors attached to count 1.  The prosecutor dismissed count 2 and the respective allegations.  Defendant was sentenced concurrently on this present case and in Kern County Superior Court case No. BF142634A.[3]  The court denied probation and sentenced defendant to a prison term of six years in case

---

[1]  By order dated July 19, 2013, this court construed defendant's notice of appeal filed on March 7, 2013, to be an appeal from the judgment entered in Kern County Superior Court case No. BF142634A as well as Kern County Superior Court case No. BF144431A.

[2]  All future statutory references are to the Penal Code unless otherwise noted.

[3]  All future references to case numbers are to Kern County Superior Court case numbers.

In companion case No. BF142634A, defendant pled no contest on July 3, 2012, to one felony charge of criminal threats (§ 422) and one felony charge of entering an inhabited dwelling with intent to commit a felony (§ 460, subd. (a)).  On August 1, 2012, the court sentenced defendant in case No. BF142634A to one year in jail and admitted him to probation for three years.  On October 11, 2012, defendant was arraigned on a violation of probation based on the conduct charged in case No. BF144431A.  After his motion to suppress evidence was denied in case No. BF144421A, defendant admitted he violated probation in case No. BF142634A in conjunction with his no contest plea in case No. BF144431A.

No. BF144431A. Defendant was sentenced to a six-year term in case No. BF142634A, which was ordered to run concurrent with defendant's sentence in case No. BF144431A.

On appeal, defendant contends the trial court erred in denying his motion to suppress because the search and seizure were the result of an unlawful detention. We hold the officer detained defendant without reasonable suspicion as required under the Fourth Amendment. Accordingly, we reverse.

## FACTUAL BACKGROUND

The facts below are taken from the December 11, 2013, suppression hearing in case No. BF144421A at which only Bakersfield Police Officer John Otterness testified.

On October 6, 2012, at approximately 10:20 p.m., Otterness was on patrol in a marked patrol vehicle with his partner, Officer Hernandez. It was dark. They were patrolling the 3400 block of Q Street in Bakersfield when they observed defendant, who was walking in the parking lot of a Fastrip convenience store from the direction of the store. The Fastrip was open for business.

Otterness had been in this area "[a]t least 40" times prior to his contact with defendant. During those previous occasions, he had dealt with narcotics crimes. He testified he had contacted street gang members in the area and was able to identify a lot of gang members. He believed individuals involved in narcotics crimes and gangs are often armed.

Otterness made eye contact with defendant, who placed his left hand inside his left pocket. The officers pulled into the parking lot without activating their lights or siren. Otterness did not see defendant make any throwing motions, and defendant did not flee when seeing the officers.

The officers parked their vehicle approximately "ten feet or so" from defendant inside the parking lot. Otterness did not see anyone else in the vicinity.

Otterness initially testified defendant was wearing "oversized baggy clothing," but on cross-examination he agreed defendant wore shorts and a T-shirt in his booking

3.

photograph and Otterness could not remember if defendant wore a sweatshirt at the time of the incident.

Otterness exited his vehicle and defendant looked over his shoulder toward Otterness while keeping his hand in his pocket. Both officers were in uniform. Otterness provided the following testimony:

> "[OTTERNESS:] I exited my vehicle and contacted [defendant].

> "[PROSECUTOR:] What did you do after you contacted the defendant?

> "[OTTERNESS:] I asked him if he could please remove his hand from his pocket for officer safety.

> "[PROSECUTOR:] What did he do after you asked him that?

> "[OTTERNESS:] He was nonresponsive and he continued to leave his left hand in his pocket.

> "[PROSECUTOR:] What did you do at that point?

> "[OTTERNESS:] I asked him to remove his hand from his pocket, and he did not.

> "[PROSECUTOR:] And, after you asked him the second time, what did you do[?]

> "[OTTERNESS:] I began to approach [defendant]. And at that point I placed him—removed his hand and placed him in a standing modified search position. And at that point I asked him if he was on probation, and he said he was."

Otterness conducted a search of defendant's person because he was afraid defendant might have a weapon. During this time, Hernandez was standing approximately four or five feet from Otterness.

Otterness patted over defendant's clothing and he felt a hard item in defendant's left pocket, which he believed might have been a knife. Otterness reached into the pocket and removed the hard item, which was a "bluetooth" earpiece. Attached to the earpiece

4.

was a baggie containing an "off white rock type substance," which Otterness suspected was cocaine base.

On cross-examination, Otterness testified he had never contacted defendant before at that location. Otterness clarified his interactions with defendant as follows:

> "[DEFENSE COUNSEL:] All right. When you got out, you approached [defendant]. Is that correct?
>
> "[OTTERNESS:] Yes.
>
> "[DEFENSE COUNSEL:] And [defendant] put his hand in his pocket?
>
> "[OTTERNESS:] He had already put his hand in his pocket prior to us pulling into the Fastrip parking lot.
>
> "[DEFENSE COUNSEL:] Okay. So he actually put his hand in his—was that his left hand or right hand?
>
> "[OTTERNESS:] It was his left hand in his left pocket.
>
> "[DEFENSE COUNSEL:] Okay. So he had already put his hand in the left hand pocket even before you drove into the parking lot. Is that correct?
>
> "[OTTERNESS:] Yes."

A short time later, the following occurred:

> "[DEFENSE COUNSEL:] Okay. So [defendant is] walking toward the street and then you pull ten feet from here?
>
> "[OTTERNESS:] Approximately.
>
> "[DEFENSE COUNSEL:] All right. You then approached him. Correct?
>
> "[OTTERNESS:] Yes.
>
> "[DEFENSE COUNSEL:] Okay. And you told him once take your hand out of your pocket. Correct?
>
> "[OTTERNESS:] As I approached him, we had already made eye contact prior to pulling in. So once I got out he kind of looked over his

5.

shoulder and his hand was still in his pocket, and he turned around to me. And at that point I asked him if he could remove his hand from his pocket and—

      "[DEFENSE COUNSEL:]  He didn't do that?

      "[OTTERNESS:]  No.

      "[DEFENSE COUNSEL:]  And then you actually repeated it and said remove your hand from the pocket.  Correct?

      "[OTTERNESS:]  I asked him if he could please remove his hand from his pocket."

A short time later, the following occurred:

      "[DEFENSE COUNSEL:]  Okay.  And that is when you approached him and put him—I'm sorry?  You said a modified—

      "[OTTERNESS:]  It is called a standard modified.

      "[DEFENSE COUNSEL:]  What is that?

      "[OTTERNESS:]  It is basically a search position, at what point that we have some sort of control over someone that we are searching so that we are not vulnerable to an attack.

      "[DEFENSE COUNSEL:]  And in order to put him in that position what do you have to ask him to do or how do you ask to get him to get himself in that position?

      "[OTTERNESS:]  I put his hand in the back of his head.

      "[DEFENSE COUNSEL:]  You said you put your hand on the back of his head[?]

      "[OTTERNESS:]  As I was approaching him.  He wasn't putting his hand in back of his head.  At that point I assisted [him] putting his hand from his pocket to the back of his head.

      "[DEFENSE COUNSEL:]  Just so we can take it one step at a time, you said you put your hand to the back of his head, and he didn't do that?

      "[OTTERNESS:]  He did not.

"[DEFENSE COUNSEL:]  And you approached closer, and you physically approached him and put his hand on his head[?]

"[OTTERNESS:]  I believe so.

"[DEFENSE COUNSEL:]  And then you asked him, are you on probation or parole[?]  Correct?

"[OTTERNESS:]  Yes."

*Oral arguments*

Defense counsel argued a detention occurred when the officer told defendant to remove his hand twice and then physically moved defendant's hand to his head.  Defense counsel argued no reasonable suspicion existed for the detention.

The trial court commented that the "whole issue is whether or not a person placing their hand in their pocket when they see an officer and then not removing it does that give reasonable cause for the detention?"

The defense attorney noted defendant's hand was in his pocket "before" the officers "even came into the parking lot."  She argued even if defendant put his hand in his pocket when he saw the patrol vehicle, that was not sufficient for reasonable suspicion.

The prosecutor argued this was a search for officer safety while the officer was attempting to make "consensual contact" with defendant.  The officer was not detaining defendant when he walked up to him.  The prosecutor maintained this was in a high crime area with heavy narcotic and gang activity,[4]  and defendant did not take his hand out of his pocket but continued to keep his hand in his pocket.  The prosecutor asserted *Terry v. Ohio* (1968) 392 U.S. 1 and subsequent cases applied, because the officer felt fear for his safety so a consensual contact turned into a *Terry* stop.

---

[4]     Otterness testified this area had a lot of "criminal activity" and was "also known for gangs as well as narcotics."  Defense counsel objected due to foundation, which the trial court sustained.

The court noted there was "no evidence" of any threat of officer safety. The prosecutor argued Otterness testified that "on prior occasions he had experience with narcotic and gang members here and that they carried weapons." The court responded it had no evidence that Otterness or "any member of the Bakersfield Police Department had ever been accosted in that area."

After confirming with the prosecutor that *Terry v. Ohio*, *supra*, 392 U.S. 1 was controlling, the court took a short recess to review that case. After doing so, the court stated: "I've now had a chance to review *Terry versus Ohio* and based thereon and the facts that are presented, the Court is going to deny the motion. [¶] I think that the detention was, in fact, justified, and therefore the steps have proceeded from and thereafter were justified."

## *DISCUSSION*

### A. *Standard of review*

The Fourth Amendment of the federal Constitution requires state and federal courts to exclude evidence obtained from unreasonable government searches and seizures. (*People v. Williams* (1999) 20 Cal.4th 119, 125.) Section 1538.5 allows a defendant to move to suppress evidence obtained in an improper seizure. (§ 1538.5.)

"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

There are three broad categories of police contact with individuals: a consensual encounter resulting in no restraints of liberty; a detention, which is classified as a seizure "strictly limited in duration, scope, and purpose;" or a formal arrest (or comparable restraint) of the person's liberty. (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).)

A detention occurs when, under the totality of the circumstances, a reasonable person would have believed he or she was not free to leave. (*United States v. Mendenhall* (1980) 446 U.S. 544, 554.) A detention does not occur when an officer "merely approaches an individual on the street and asks a few questions. [Citation.] As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual" and the officer does not need reasonable suspicion. (*Manuel G., supra,* 16 Cal.4th at p. 821.) A seizure will only occur when the officer restrains the person's liberty through a show of authority or physical force. (*Ibid.*)

"Consensual encounters do not trigger Fourth Amendment scrutiny. [Citation.] Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime. [Citation.]" (*Manuel G., supra,* 16 Cal.4th at p. 821.) An officer does not need to have a reasonable suspicion in order to ask questions or request identification. (*INS v. Delgado* (1984) 466 U.S. 210, 216; *People v. Lopez* (1989) 212 Cal.App.3d 289, 291.)

The prosecution bears a heavy burden to show proper justification for a search and seizure in the absence of a warrant, an arrest, or a consent to search. (*People v. Scott* (1976) 16 Cal.3d 242, 249.)

### B. Analysis

Here, defendant contends a detention occurred, triggering Fourth Amendment protection, based on how the officers' approached him and the use of verbal instructions. Defendant principally relies on *People v. Garry* (2007) 156 Cal.App.4th 1100 for the proposition that Otterness's verbal instructions for defendant to remove his hand from his pocket, coupled with the proximity of where the officers parked before speaking with defendant, established a detention.

Respondent argues the "initial contact" between Otterness and defendant was a "consensual encounter" not triggering Fourth Amendment protection. Respondent relies on *People v. Franklin* (1987) 192 Cal.App.3d 935 (*Franklin*) and *In re Frank V.* (1991)

9.

233 Cal.App.3d 1232 (*Frank V.*) to establish Otterness's verbal instructions for defendant to remove his hand from his pocket was an insufficient "show of authority" to create a detention.

We need not analyze or determine whether the officers' initial actions, including Otterness's verbal instructions, created a detention because Otterness removed defendant's hand and placed him in a standing, modified search position with defendant's hand at the back of his head. When Otterness physically controlled defendant, a seizure occurred because defendant's liberty was restrained through physical force and a show of authority. (*Terry v. Ohio, supra,* 392 U.S. at p. 19, fn. 16; accord, *Manuel G., supra,* 16 Cal.4th at p. 821; *People v. Souza* (1994) 9 Cal.4th 224, 229.) As such, a detention occurred whether or not the prior, brief "interaction" between Otterness and defendant was consensual. Because defendant was seized, the issue is whether the officer was justified in doing so.

Officers may temporarily detain a person so long as it is based on "some objective manifestation" that criminal activity is occurring and the person detained is involved. (*United States v. Cortez* (1981) 449 U.S. 411, 417 & fn. 2; *People v. Souza*, *supra*, 9 Cal.4th at p. 230; *Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784 [a detention requires "'an articulable suspicion that a person has committed or is about to commit a crime'"].) The detaining officer must "point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza*, *supra*, at p. 231.) We focus on the totality of the circumstances in assessing whether the particularized and objective facts known to the police provided reasonable cause to detain defendant. (*Id.* at p. 238.)

"The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The

10.

analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person." (*United States v. Cortez, supra*, 449 U.S. at p. 418.)

"The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." (*United States v. Cortez, supra,* 449 U.S. at p. 418.)

Here, defendant was walking through the parking lot of an open Fastrip while the officers were driving on the street. Defendant made eye contact with Otterness and put his hand in his pocket. Otterness did not see defendant make any throwing motions, and defendant did not flee when seeing the officers. Although Otterness knew the area and knew "a lot of street gang members" living in the area, Otterness did not link defendant to any street gang or to gang activity. Indeed, Otterness testified he had never contacted defendant in that area.

Otterness did not articulate specific facts that would cause a reasonable officer to suspect defendant was involved in criminal activity or that such activity had just occurred or was about to occur. There is nothing in the record to indicate the officers had received any report of gang activity in that area or a report that a crime had been committed in the area that night. There is no evidence the officers observed any criminal activity that night prior to contacting defendant. There is no evidence defendant acted in a furtive manner or attempted to avoid the officers.

Moreover, as the trial court noted, there was no evidence the officers' safety was at risk. There is no evidence defendant made any threatening movements towards the officers. Even if defendant was wearing "baggy clothing" at night in a high crime area, as Otterness stated, that does not reasonably support a suspicion that defendant was

11.

armed and dangerous.  (*People v. Roth* (1990) 219 Cal.App.3d 211, 213, 215 [detention was illegal of suspect wearing "heavy, bulky jacket or two jackets" where officer could not describe any criminal activity].)  Further, a nonspecific belief a person potentially may be armed is insufficient to justify a Fourth Amendment search.  (*People v. Dickey* (1994) 21 Cal.App.4th 952, 956.)  The facts do not withstand Fourth Amendment scrutiny.

Respondent argues the issue is not whether the officer had reasonable suspicion that defendant was involved in criminal activity, but, rather, whether the patdown was justified for officer safety, citing *Terry v. Ohio*, *supra*, 392 U.S. at page 27. Respondent's arguments, however, fail to address or discuss the seizure which occurred prior to the patdown, and whether that physical detainment was constitutionally justified. As discussed above, it was not.  Moreover, *Terry v. Ohio* does not support respondent's position.  In that case, the United States Supreme Court made it clear an officer may only detain a person if the officer first has observed "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.  Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken." (*Terry v. Ohio*, *supra*, at pp. 30–31.)

The officer in *Terry v. Ohio* was able to give reasonable articulable facts justifying his seizure and patdown based on the suspects' actions that reasonably showed they were checking businesses for a daylight robbery.  (*Terry v. Ohio*, *supra*, 392 U.S. at p. 28.)

12.

Here, respondent has failed to point to any reasonable facts justifying defendant's detention. Our independent review of the record confirms that no such facts exist.[5]

We are likewise unpersuaded by respondent's reliance on *Franklin, supra,* 192 Cal.App.3d 935 and *Frank V., supra,* 233 Cal.App.3d 1232, authorities which respondent uses to argue a consensual encounter occurred here.

In *Franklin*, authorities found a body in a motel room. The victim had been shot twice and his pockets were turned inside out. A search of the room showed a .22-caliber shell casing and drug paraphernalia. About 20 or 30 minutes before the discovery of the body, a police officer was patrolling in an area where vandalism, robbery and narcotics trafficking were common. The officer spotted the defendant, who was walking about one-half block away from the homicide scene. The defendant was wearing a full-length camouflage jacket, which the officer thought was odd on a warm summer evening. The officer shone his patrol car spotlight on the defendant. (*Franklin, supra,* 192 Cal.App.3d at p. 938.)

The officer noticed the defendant was carrying "a white cloth-like object," which he seemed to try to conceal from the light. The officer stopped his vehicle directly behind the defendant and radioed his position. While the officer was on the radio, the defendant approached the patrol car on the passenger side. When the officer exited the vehicle, the defendant came toward him and they met in the area of the headlights. The defendant kept asking, "'What's going on?'" (*Franklin, supra,* 192 Cal.App.3d at p. 938.)

---

[5]  Defendant's probationary status also does not justify the detention because Otterness did not inquire about defendant's probation status until after he seized defendant. Otterness did not testify he was aware of defendant's probation status before the encounter. "[A] search cannot be validated by the discovery, after the fact, that the defendant was subject to a probation or parole search condition." (*People v. Brendlin* (2008) 45 Cal.4th 262, 272.)

The officer noticed the defendant was sweaty and seemed "'real jittery, hyper.'" The officer asked the defendant to remove his hands from his pockets and, when the defendant did so, the officer saw what appeared to be a film of blood on his hands. The officer also saw a visible cork-stopped vial containing a white powdery substance in his pocket. (*Franklin, supra,* 192 Cal.App.3d at p. 938.) The defendant put his hands back in his pockets and, when told to remove them again, the defendant fled. The officer chased and tackled him. A vial containing white powder, a .22-caliber semiautomatic pistol, an unspent .22-caliber cartridge and another vial were discovered in areas where the officer spoke with the defendant and later struggled with him. At the police station, belongings of the victim were discovered in the defendant's possession. The trial court denied the defendant's motion to suppress.

On appeal, this court held a detention did not occur between the time the officer first spotted the defendant walking on the street and when the defendant removed his hands from his pockets. The appellate court stated the "spotlighting" of the defendant with the car light, by itself, did not represent a sufficient "show of authority" so that the defendant did not feel free to leave. (*Franklin, supra,* 192 Cal.App.3d at p. 940.) The *Franklin* court also did not find the officer's act of pulling his vehicle to the curb behind the defendant constituted an "'additional overt action'" that would convince a reasonable man he was not free to leave. Finally, the *Franklin* court rejected the argument that the officer's request for the defendant to remove his hands from his pockets created a detention. (*Id.* at p. 942.) As such, the *Franklin* court did not agree the defendant was improperly detained before he fled and was tackled.

Here, *Franklin* does not alter the constitutional requirement of reasonable suspicion to justify the seizure and patdown of defendant. As noted earlier, it is immaterial whether or not Otterness had a "consensual encounter" with defendant prior to physically restraining him. As such, *Franklin* is inapposite to our discussion and does not establish a valid Fourth Amendment seizure.

We are also unpersuaded by *Frank V., supra,* 233 Cal.App.3d 1232, in which two officers were dispatched to investigate a report of reckless motorcycle driving on a street in an active gang area. The officers arrived at that location and noticed a motorcycle with two riders pulling away from a curb in front of a house known for gang activity. The officers made a U-turn with the intention of making a traffic stop. As soon as they made the turn, the motorcycle pulled to the curb even though the officers never activated their overhead lights or sirens. (*Frank V., supra,* at p. 1237.)

The officers approached the motorcycle and the driver held out an apparent driver's license in his left hand while the passenger (the defendant) looked straight ahead with both hands in the front pockets of a bulky leather jacket. The defendant was ordered to remove his hands from his pockets, which he did, but he then tried to put them back inside his pockets. The defendant was ordered to keep his hands out and an officer did a patdown search of the defendant for weapons and discovered a gun in the defendant's right front jacket pocket. (*Frank V., supra,* 233 Cal.App.3d at p. 1237.) In the trial court, the defendant filed a motion to suppress the gun as evidence, which the court denied.

On appeal, the *Frank V.* court determined the defendant was not detained prior to the patdown search because the motorcycle driver "voluntarily pulled over to the curb before the officers completed the U-turn or displayed any gesture of authority, such as using overhead lights or a siren." (*Frank V., supra,* 233 Cal.App.3d at pp. 1237–1238.) Because the motorcycle was not detained, the appellate court determined the defendant was also never detained. (*Id.* at p. 1238.) Moreover, the court stated the order for the defendant to remove his hands "did not transform the consensual encounter into a detention." (*Ibid.*) The court was "sensitive to the delicate balance between Fourth Amendment rights and a police officer's safety." (*Ibid.*) Noting it would be unreasonable to require officers to take unnecessary risks when performing their duties, and noting the high percentage of murders of officers that occur during traffic stops, the *Frank V.* court stated it was not intrusive for the officer to order the defendant to remove

15.

his hands. (*Ibid.*) As such, the court stated because the defendant was not initially detained, he was not the subject of the officers' inquiry, and he was only told to remove his hands from his pocket, a detention did not occur. (*Id.* at p. 1239.)

Here, unlike in *Frank V.*, defendant was the subject of the officers' inquiry. Unlike the motorcycle driver in *Frank V.*, defendant did not act in a manner that might have demonstrated a voluntary consent to the police interaction. There are no facts indicating defendant stopped, or held out identification, or spoke to the officers either before or during the time Otterness seized him. Unlike in *Frank V.*, defendant was physically restrained before he was searched. Because defendant was seized, *Frank V.* is distinguishable and does not provide Fourth Amendment justification for defendant's detention.

Because there was no reasonable suspicion defendant had committed or was about to commit a crime, defendant's Fourth Amendment rights were violated when he was seized.[6] (*Terry v. Ohio, supra,* 392 U.S. at pp. 30–31; *People v. Souza, supra,* 9 Cal.4th at p. 230; *Wilson v. Superior Court, supra,* 34 Cal.3d at p. 784.) Defendant's motion to suppress should have been granted.

## *DISPOSITION*

The judgments are reversed in Kern County Superior Court case Nos. BF142634A and BF144431A. Both matters are remanded to the trial court. On remand, the trial court shall enter an order granting defendant's motion to suppress.

---

[6]     Because the detention was improper, we do not address respondent's contentions the "scope of the pat-search" was proper.

16.