Filed 12/14/22  P. v. Wright CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>DIONTAE STEPHVON WRIGHT,<br><br>　　　Defendant and Appellant. | A160784<br><br>(Mendocino County Super. Ct.<br>　No. SCUKCRCR1792125) |

Defendant Diontae Stephvon Wright appeals from his conviction after a jury found him guilty of first degree robbery and reckless driving while evading a peace officer.  Wright contends the trial court abused its discretion in denying his *Pitchess*[1] motion to discover information in police personnel files.  In denying the motion, the trial court held that Wright failed to make the requisite showing of good cause in setting forth any plausible scenario of police misconduct.  We agree, but remand the matter for the limited purpose of resentencing under amended Penal Code section 1170, subdivision (b)(6).[2]

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[2] All further statutory references are to the Penal Code unless otherwise specified.

1

## BACKGROUND

In 2017, Sally Gurule shared a home in Willits with her adult son, Van Slagle (Van). Gurule's other adult son, Justin Slagle (Justin), occasionally stayed there.[3] Gurule grew marijuana at the property and stored the harvested marijuana in both her garage and inside the house. On October 27, 2017, at around midnight, Justin came to stay over after working all day. Gurule was sleeping in her room and Van was taking a shower. Justin promptly fell asleep on the couch and was awoken by someone pointing a shotgun at his face and telling him to get down on the floor. Justin later identified this person as Wright. Wright was accompanied by two other individuals who were later identified as Christopher Bradford and Michael Taylor. They ordered Gurule and Van at gunpoint to get down on the floor as well. The intruders went through the house and asked where the cash and cell phones were. Gurule responded she did not have any cash. They then took two large bins of marijuana from a bedroom closet and ordered Gurule and her sons to go into the closet, which they did. Shortly after, Justin came out and went to the back door, which was next to the driveway. He saw the three men dumping the marijuana into garbage bags and putting them in the back of a red or orange Jeep, before driving off.

After this robbery was reported at around 1:30 a.m., police officers Curtis Labus and Justin D'Orazio positioned their patrol cars at an intersection that the Jeep would likely be driving through. After spotting the Jeep, Labus and D'Orazio activated their lights and sirens and pursued it. The Jeep accelerated to up to 70 miles per hour and then slowed down and ran a stop sign. As the Jeep slowed down, Bradford and Taylor jumped out of

---

[3] To avoid confusion, we refer to the Slagle brothers by their first names and mean no disrespect in doing so.

2

it. Labus continued to pursue Wright in the Jeep while D'Orazio pursued Bradford and Taylor.

During his pursuit, Officer Labus saw the Jeep slow down at one point as the driver's side door began to open. To prevent Wright from jumping out, Labus pulled his vehicle alongside the Jeep. As he did so, the Jeep turned into his patrol vehicle, causing Labus to sideswipe the Jeep. Wright then opened his driver's door into Labus' moving vehicle, which caused the door to the Jeep to break. Wright then ran off. Shortly after, Labus and Deputy Jack Woida detained Wright after someone reported a black male adult lying in the corner in a yard behind their apartment. Wright's wallet and identification were found in the driver's side door of the Jeep. Another officer brought Justin to where Wright was to make an in-field identification. Justin identified Wright as the one who had held a shotgun to his face.[4]

After Bradford and Taylor jumped out of the Jeep, they ran through an opening in a fence. Officer D'Orazio, who was pursuing them in his vehicle, turned toward the fence but was unable to brake in time and struck the fence. He continued his pursuit, lost sight of Bradford, but detained Taylor. Bradford was later detained by Officer Michael Bennett after being seen walking on the side of the road with debris and fresh tears on his clothing. Bradford's appearance was consistent with the description that Bennett was provided earlier of this fleeing suspect.

Wright and Bradford were charged with three counts of kidnapping to commit robbery (§ 209, subd. (b)(1); counts one to three), first degree robbery in concert with two or more individuals (§§ 211, 213, subd. (a)(1)(A); count four), three counts of assault with a firearm (§ 245, subd. (a)(2);

_____

[4] At trial, Wright maintained that he remained in the Jeep on the night of the robbery and did not hold a shotgun to Justin's face.

3

counts five to seven), reckless driving while evading a peace officer (Veh. Code, § 2800.2, subd. (a); count eight), driving on a highway against traffic while evading a peace officer (Veh. Code, § 2800.4; count nine), and assault with a deadly weapon other than a firearm on a peace officer (§ 245, subd. (c); count ten).[5]  Counts one to seven included a special allegation of personal use of a firearm (§ 12022.53, subd. (b), 12022.5, subd. (a)).

Prior to trial, Wright filed a *Pitchess* motion to discover the personnel files of eight peace officers:  five from the Mendocino County Sheriff's Office and three from the Willits Police Department.  The motion alleged that the officers engaged in dishonesty and racial bias, falsified police reports and used excessive force.  The trial court heard and denied the motion in its entirety.

Following a jury trial, Wright was found guilty of first degree robbery, assault with a firearm, reckless driving while evading a peace officer, and driving against traffic while evading a peace officer (counts four to nine).  The jury found not true the firearm allegations with respect to counts four to seven.  The jury further found Wright not guilty of assault with a deadly weapon on a peace officer (count ten).  The jury was unable to reach a verdict as to the three kidnapping counts and a mistrial was declared as to counts one to three.  The prosecution subsequently dismissed these charges pursuant to a negotiated plea in exchange for Wright's agreement to a special arming allegation pursuant to section 12022, subdivision (a)(1).

On June 14, 2019, the trial court sentenced Wright to an aggregate term of eight years and eight months in state prison.

---

[5]  Taylor was charged with robbery in the original complaint but entered into a plea before the preliminary hearing.

Wright's appeal was deemed constructively and timely filed by this court.

## DISCUSSION

### I.

### *Standard of Review*

A *Pitchess* motion provides that "a criminal defendant [can] 'compel discovery' of certain relevant information in the personnel files of police officers by making 'general allegations which establish some cause for discovery' of that information and by showing how it would support a defense to the charge against him." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018-1019 (*Warrick*).) "A motion for discovery of peace officer personnel records is addressed to the sound discretion of the trial court" and is reviewed only for abuse of discretion. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

### II.

### *Pitchess Motion Requirements*

The discovery of a police officer's personnel files by a criminal defendant involves a two-step procedure. A defendant must first file a motion that describes the type of records sought, supported by "[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records." (Evid. Code, § 1043, subd. (b)(3).) If the trial court finds good cause for discovery, it proceeds to the second step and "reviews the pertinent documents in chambers and discloses only that information falling within the statutorily defined standard of relevance." (*Warrick, supra*, 35 Cal.4th at p. 1019.)

5

To show good cause under the first step, "defense counsel's declaration in support of a *Pitchess* motion must propose a defense or defenses to the pending charges. The declaration must articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence . . . ." (*Warrick, supra,* 35 Cal.4th at p. 1024.) The declaration "must also describe a factual scenario supporting the claimed officer misconduct" that establishes "a plausible factual foundation" for the misconduct. (*Id.* at pp. 1024-1025.) Where the trial court has pertinent documents such as police reports and witness statements in addition to defense counsel's affidavit, the court "determines whether defendant's averments, '[v]iewed in conjunction with the police reports' and any other documents, suffice to 'establish a plausible factual foundation' for the alleged officer misconduct and to 'articulate a valid theory as to how the information sought might be admissible' at trial." (*Id.* at p. 1025.) A plausible scenario "presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges." (*Id.* at p. 1026.)

A defendant "need not present a factual scenario that is reasonably likely to have occurred or is persuasive or even credible." (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1318.) However, a court is permitted "to apply common sense in determining what is plausible, and to make determinations based on a reasonable and realistic assessment of the facts and allegations." (*Id.* at pp. 1318-1319.) For example, our Supreme Court found that good cause was shown where a defendant alleged a specific factual scenario that police officers used excessive use in arresting him. This, combined with the fact that the police reports indicated that considerable force was used, was enough to establish a plausible factual foundation for an

6

allegation of misconduct. (*City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 85-86 (*Santa Cruz*).)

## III.

### *The Trial Court Did Not Abuse Its Discretion in Denying Wright's Motion.*

Wright argues that the trial court abused its discretion in denying his *Pitchess* motion.[6] We disagree. Wright's motion alleged various misconduct against eight peace officers. We summarize and discuss each alleged instance of misconduct below.

### A. Sergeant Cromer

Wright alleged that Sergeant Quincy Cromer was dishonest in his police report because he purposefully omitted that Justin used the word "n- - - - r" during his in-field identification of Taylor. During this in-field identification, which was also audiotaped, Justin commented that he recognized Taylor by his sweatshirt and "his dreadlocks or whatever they are, those n- - - - r braids hanging out from his hat, underneath [h]is hood." Cromer's report stated that "Justin said he was able to positively identify the suspect by his hair and his sweatshirt with writing." The report however, also noted that the audio recording of this identification was booked into evidence.

The trial court held Wright had not alleged a plausible scenario of misconduct. The court noted that Cromer had recorded the in-field identification and that an officer cannot be expected to include everything said in a recording in his report. The court further stated it did not attribute

---

[6] On appeal, Wright broadly argues that the trial court abused its discretion given the low threshold showing of good cause needed for a *Pitchess* motion but provides little analysis as to how his allegations against *each* officer established a plausible factual foundation for peace officer misconduct.

any racist statement or motives Justin may have had to Cromer.  We agree with the trial court's reasoning.  Wright has not alleged a plausible factual foundation that Cromer attempted to conceal Justin's racist remark where Cromer not only recorded the in-field identification but booked it into evidence and referenced the recording in his report.  These facts present an internal inconsistency with Wright's allegation of misconduct against Cromer.

## B. Deputy Woida

Wright alleged that Deputy Woida:  (1) lied in his report that Justin identified Wright *after* Wright was removed from the police vehicle; (2) lied in his report that Justin recognized Wright by his clothing; (3) struck and interrogated Wright after handcuffing him; and (4) fabricated a statement that dispatch had located Wright's driver's license in order to justify his detention of Wright.

As to the first allegation, Wright's motion argued that in the recording of Justin's in-field identification, Justin identified Wright before he was removed from the police vehicle, but Woida falsely wrote in his report that Justin identified Wright after he was removed from the vehicle. In the transcript of the recording, Justin stated, before the sound of a door opening was noted, "I can tell you right now it's him."  After the door opened and 15 seconds were noted to have passed, Justin confirmed, "Yup, that's him."  The trial court held that there was no plausible scenario of misconduct based on Woida's report and the transcript.  It was simply that not every statement from the transcript was included in the report.  We agree.  Justin affirmatively identified Wright after Wright was removed from the police vehicle, which was what Woida included in his report.  That Justin may have

8

been eager to make his identification does not support any dishonesty or misconduct by Woida.

As to the second allegation, Wright argued that Woida's report falsely stated that Justin recognized Wright by his clothing when Justin made no such statement during the in-field identification. The report stated that Justin identified Wright as "suspect number one based on seeing [Wright's] face and remembering the clothing he was wearing (refer Deputy Byrnes case report 17-31567)." Deputy Clint Byrnes had interviewed Justin at the residence immediately after the robbery and then drove him to where Woida and Wright were for the in-field identification. Byrnes' report noted that Justin described Wright ("Suspect #1") as wearing "a black hooded sweatshirt . . . black pants, and black Nike shoes."

The trial court held a plausible scenario had not been alleged that Woida intended to lie or to mislead. We agree. Wright failed to establish a plausible factual foundation to support that Woida fabricated in his report that Justin had commented on Wright's clothing during his identification. Woida's report did not state this but only noted that Justin's identification of Wright was aided by his recollection of what Wright was wearing. The report specifically referenced Byrnes' report with respect to Justin's recollection of Wright's clothing. Woida's report also included that the audio recording of the in-field identification was booked into evidence, which further negates the allegation that he intended to fabricate something that the recording did not include.

The third allegation of misconduct was that Woida struck and interrogated Wright after handcuffing him. Wright's only support for this was that Woida stated in his report that he asked Wright information about his identity after handcuffing him but did not record this conversation. At

9

the hearing for the motion, Wright's counsel did not bring this point up as a basis for misconduct against Woida. The trial court nonetheless denied the motion in its entirety based on Wright's failure to establish any plausible scenario of misconduct. We see no abuse of discretion. Wright failed to describe a *specific* factual scenario of misconduct as required under the first step of a *Pitchess* motion. (*Warrick, supra*, 35 Cal.App.4th at p. 1025.) There were no documents cited to support his allegation, and to hold that the absence of a recording alone plausibly meant that excessive force was used is an unreasonable conclusion.

Lastly, the motion alleged that before Woida found Wright's driver's license in the Jeep, he "fabricated the statement that dispatch informed him that they had Diontae Wright's Driver's License in order to justify his detention of Mr. Wright while he searched the Jeep." In opposition to the motion, the Mendocino County Sheriff's Office clarified this was simply a misreading of Woida's report. The report noted that dispatch had "located" a driver's license that matched Wright's name. This did not mean that dispatch physically located Wright's driver's license, but only that it had located the license in its computer system. Wright did not challenge this point at the hearing. Accordingly, we find no plausible scenario of misconduct.

### C. Detective Lima

The motion next argued that Detective Zemanuel Lima omitted from his report that Wright said he wanted to stop talking and get an attorney during their interview. The report itself however, stated, "Wright mentioned his attorney and he was specifically asked if he remembered his rights and wanted to continue talking. Wright said he did want to continue talking and asked why the interview was continuing if we had all the information."

10

In the transcript of the recorded interview, Wright stated at one point that he "want[ed] to stop talking and get a lawyer." He then continued talking without any questions being posed to him, and the detective asked Wright multiple times whether he wanted to continue talking. Wright responded, "Well I want to make that decision as we talk more." The detective then stated, "That's not how it works" to which Wright replied, "I haven't even stated I want a lawyer present, I'm just saying like, the more we talk, then I'll know." The interview then proceeded and Wright answered the rest of the detectives' questions.

The trial court held that the above did not rise to misconduct or an attempt to conceal any misconduct. We agree. In the context of the whole interview, the trial court noted that after Wright referenced getting an attorney, the detectives had a lengthy discussion with him to clarify whether he wanted to have an attorney, before proceeding with the interview. Wright expressly stated, somewhat contrary to his earlier statement, that he had not stated he wanted an attorney present.[7] Similar to the allegations of falsity against Cromer and Woida, Wright has not established a plausible factual foundation for alleged misconduct where Lima's report accurately summarized but merely did not include everything contained in the transcript of the interview. The video and audio recordings of the interview were also placed into evidence and are inconsistent with the allegation that Lima lied in an attempt to conceal any violation of Wright's Fifth Amendment rights.

---

[7] The trial court reasoned this was because Wright "was attempting to get the detectives to show their hand or tell him what evidence they had in order to facilitate his decision in terms of whether or not he wanted to be represented by counsel."

11

**D. Sergeant Porter**

Wright's motion briefly alleged that "when Sergeant [Andrew] Porter "removed Diontae Wright from the vehicle for his in-field identification, he struck Mr. Wright and dragged him out of the vehicle with excessive force." At the hearing on the motion, Wright's counsel argued that this allegation was supported by a recording of Justin's in-field identification of Wright with Woida. The transcript of the recording noted that as Porter took Wright out of his patrol vehicle from a distance for the in-field identification, there was "sound of shuffling and door opening; 15 seconds pass." After confirming that Wright was not charged with resisting arrest, the trial court denied the motion as to Porter and stated, "The idea that Sergeant Porter struck Mr. Wright comes out of the whole cloth here."

We find no abuse of discretion. To establish a plausible factual foundation for misconduct, a *specific* factual scenario must be described and is considered in conjunction with pertinent documents such as police reports. (*Warrick, supra*, 35 Cal.App.4th at p. 1025.) In *Santa Cruz, supra*, 49 Cal.3d at page 79, the defendant alleged in support of his claim of excessive force that the officers grabbed his hair, threw him to the ground, and stepped on his head when they arrested him. The police reports likewise stated that the officers struck defendant and wrestled him to the ground. (*Id*. at p. 93.) Our Supreme Court concluded, "Viewed in conjunction with the police reports, counsel's averments establish a plausible factual foundation for an allegation of excessive force . . . ." (*Id*. at p. 86.) By contrast, a general allegation that officers did not obtain "knowing and voluntary consent to enter" defendant's residence, unsupported by any police reports, "failed to provide a 'specific factual scenario' establishing a 'plausible factual foundation' for this

12

allegation." (*City of San Jose v. Superior Court* (1998) 67 Cal.App.4th 1135, 1147.)

Here, Wright made a general allegation that Porter used excessive force and struck him as he was getting out of the patrol car. Wright provided no further details as to what this excessive force entailed or the circumstances of the alleged strike. There were no police reports that supported the use of excessive or considerable force against Wright. A reasonable and realistic assessment of the notes of "shuffling" and 15 seconds having passed in the recording does not support that Porter used any excessive force or hit Wright. Indeed, there was another note of "shuffling sounds" in the transcript when Woida handed Justin some paperwork to sign. This is inconsistent with the allegation that "shuffling" should plausibly be interpreted as the sound of a physical alteration or struggle.

## E. Deputy Byrnes

Wright alleged that Deputy Byrnes: (1) omitted from his report the identity of a witness, "Josh" who had previously been to Gurule's residence to buy marijuana and "[knew] who committed the robbery"; (2) omitted certain statements in his report made by Justin regarding his recollection of the robbery; (3) instructed Justin to lie about previously seeing Josh so as not to expose Gurule's illegal marijuana activity; and (4) concealed information regarding Gurule's marijuana business to protect her credibility as a witness.

As to the first allegation, in the recording of Byrnes' interview with Gurule and her sons, "Josh" was first mentioned by Van, who stated, "They were running around with Josh's 40 Glock." Later in the interview, Justin stated, "Whoever that other guy that came up here with Josh was the other guy." Byrnes' report did not mention "Josh." In denying the motion as to Byrnes, the trial court concluded, "So the narrative section of the police

13

report is about eight pages. And I understand the point that not everything that is said in the transcripts, the recordings of three separate individuals, over 50 pages, is going to be included in the summary." For the same reasons discussed above, we find no abuse of discretion where the police report was only meant to be a summary and the recording of the full interview was placed into evidence.

Likewise, that Byrnes did not include every single statement made by Justin during the interview regarding his recollection of what occurred during the robbery does not create a plausible scenario of misconduct. The report itself noted that a disk containing the victims' statements was placed into evidence. This is not internally consistent with an allegation that Byrnes attempted to conceal certain statements made by Justin. (See *Warrick, supra,* 35 Cal.4th at p. 1026.)

The final two allegations were that Byrnes attempted to conceal certain information so as not to expose Gurule's illegal marijuana business and diminish her credibility. The trial court was not persuaded and stated, "I think it's obvious from everything I read that it was a marijuana robbery from the get-go and that the victims were engaged in illegal activity, at least two of them." We agree. In his report, Byrnes noted Gurule's statement that the suspects took "two gray-colored Rubbermaid type bins" that were in her bedroom closet. The first bin "had about 2-3 pounds of processed marijuana bud and the other bin was about half full of marijuana shake." The report then noted that Gurule advised him that she sold "several pounds of marijuana for $700 per pound." This again, is plainly inconsistent with any allegation that Byrnes was attempting to conceal that Gurule grew or sold marijuana.

14

### F. Officer D'Orazio

Wright alleged that during the pursuit of Bradford and Taylor, Officer D'Orazio attempted to strike these two with his patrol car as they ran through a fence opening. D'Orazio's report stated that when he saw Bradford and Taylor run through the fence opening, he "turned towards the fence and applied the brakes to [his] patrol vehicle." His report then noted he "was unable to stop [his] patrol vehicle and struck the fence." Wright argued that based on what was included in this report, "the only explanation" for why D'Orazio drove towards the fence was because he intended to hit the two suspects.

The trial court concluded it did not "see any plausible scenario relating to the defense that has been made out against Officer D'Orazio's conduct." The court reasoned, "When there's a high-speed chase after a felony is committed and people are possibly armed and drive recklessly through a populated area in the middle of the night, it's not at all surprising that something like this might happen." The court further noted that there was an "extra judicial statement of another one of the co-defendants who largely corroborates what was said by the various officers in this case."

This allegation of misconduct does not appear to relate to any defense in Wright's case, since Wright was not involved in this incident. In any event, we find no abuse of discretion in the trial court's conclusion that the circumstances surrounding the chase, including that it occurred late at night, combined with D'Orazio's explanation in his report as to why he accidently hit the fence, does not create a plausible scenario that D'Orazio purposefully tried to hit Bradford and Taylor. The trial court's reference to the corroborating extra judicial statement made by Taylor, as set forth in the Willits Police Department's opposition to the motion, further supports the

15

court's conclusion that a plausible factual foundation for misconduct had not been established.[8]

### G. Officer Labus

Wright argued that during the other high-speed chase in which he was involved, Officer Labus "deliberately rammed the Jeep to seriously injure the driver, and then fabricated the statements about the Jeep's driving in order to justify the damage he caused to the Jeep." Labus' report stated that the Jeep was driving erratically and at one point turned into Labus' vehicle, which caused Labus to sideswipe the Jeep. The trial court questioned how this allegation was relevant to Wright's case since Wright denied that he was even in the Jeep at this time. Wright's counsel responded that the allegation did not relate to excessive force but was relevant to Labus' dishonesty as a witness.

The trial court found that Wright had not established a plausible scenario that Labus intentionally rammed his vehicle into the Jeep. The court reasoned that this was a dangerous and high-speed chase in a populated area following an armed robbery, and that "some slight collision or damage to one or more of the vehicles isn't at all surprising." We find no abuse of discretion in this reasonable and realistic assessment of the facts, especially given the chaotic setting of the chase and Wright's erratic actions in attempting to flee. Indeed, as the report noted, Wright opened his driver's door into Labus' moving vehicle at the end of the chase so he could escape, causing the door to the Jeep to break off.

---

[8] The opposition argued that Taylor made a series of in-custody admissions, none of which included that D'Orazio tried to run him over or otherwise used excessive force in apprehending Taylor.

16

## H. Officer Bennett

Finally, Wright argued that "the suspect who fled the Jeep was merely described to Officer Bennett as a black male adult, and Officer Bennett dishonestly wrote [in his report] that he was informed that the suspect was light-skinned and wore dark clothes because that was consistent with the way Christopher Bradford looked when he stopped him." Bennett's report stated he was advised of a fleeing suspect wearing dark clothing and "described as being a light skinned, black, male adult." Several hours later, Bennett observed Bradford, who matched this description, walking on the side of the street. Bennett detained Bradford and asked for his name. Bradford responded with a fake name and became defensive when he was asked to provide his middle name. After Bradford's identity was confirmed, Bennett placed him under arrest for false identification to a police officer.

The trial court found no plausible scenario that Bennett falsified anything in his report. The trial court stated, "whether you describe somebody as a light-skinned African American wearing dark clothes or a Black male adult, I'm not seeing that as a rising to some level of misconduct." We find no abuse of discretion. Aside from Bennett's police report, there is no evidence in the record indicating precisely who dispatched Bennett or what phrase that individual used to describe the fleeing suspect, and Wright's suggestion it was "black male adult" is speculation. Nor does the description Bennett's report states he was given conflict with references in other reports that some of the suspects were adult African-American men. It is plain from the police reports in this case that there was ongoing communication between the officers who responded to the scene of the crime and interviewed the victims and those who were dispatched to other areas seeking to apprehend the suspects.

17

Moreover, Justin, who was interviewed by Officer Byrnes at his mother's home while these events were ongoing, described one of the suspects as "a lighter skinned black male adult" and a second suspect as "a Hispanic or dark skinned white male adult" to Byrnes. Wright was later identified as the first suspect and Bradford as the second suspect. Thus, Wright's assertion that none of the reports described the fleeing suspect as "anything but just an African American male" is belied by Byrnes's police report. Finally, Bradford was seen walking on the side of the road at 5:30 a.m. wearing dark clothing, which matched the description Bennett's report stated he was given. This provided Bennett reasonable grounds to detain Bradford for questioning. (See *People v. Souza* (1994) 9 Cal.4th 224, 241 ["The time of night is another pertinent factor in assessing the validity of a detention"].) Bennett thus had no reason or motivation, based on the record, to bolster the validity of his detention of Bradford. In light of this record, Wright failed to allege a plausible scenario of Bennett fabricating information contained in his report.

In sum, we do not find that the trial court abused its discretion in denying the *Pitchess* motion because Wright failed to meet his burden to present a plausible factual scenario to support any claimed police misconduct.

## IV.

### *Resentencing Following Senate Bill No. 567*

In his supplemental brief, Wright argues he is entitled to resentencing based on a recent amendment to section 1170, subdivision (b) which became effective on January 1, 2022.[9] We agree.

---

[9] The People agree that remand for resentencing is warranted based on amended section 1170, subdivision (b).

18

Section 1170, subdivision (b)(6) currently provides: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] . . . [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (§ 1170, subd. (b)(6)(B).) A youth is defined as "any person under 26 years of age on the date the offense was committed." (§ 1016.7, subd. (b).)

Wright was sentenced to a midterm of six years for first degree robbery (count four). He was 24 years old at the time of the robbery and his judgment was not yet final at the time the amendment took effect. Therefore, the ameliorative change in section 1170, subdivision (b), applies retroactively to him. (See *In re Estrada* (1965) 63 Cal.2d, 740, 746.)

## DISPOSITION

This matter is remanded for the limited purpose of resentencing under section 1170, subdivision (b)(6). In all other respects, the judgment is affirmed.

_____

STEWART, P.J.

We concur.

_____

RICHMAN, J.

_____

MILLER, J.

*People v. Wright* (A160784)